**LIKINS–FOSTER HONOLULU CORP. et al., Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 10060–10061.**

United States Court of Appeals Tenth Circuit.

Oct. 16, 1969.

Roy C. Lytle, Oklahoma City, Okl., for petitioners.

Louis M. Kauder, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Department of Justice, Washington, D. C., on the brief), for respondent.

Before PICKETT, HILL and HOLLO-WAY, Circuit Judges.

PICKETT, Circuit Judge.

Likins-Foster Honolulu Corporation and its shareholders petitioned for a review of adverse decisions of the Tax Court redetermining deficiencies against Honolulu and various wholly or partially owned subsidiaries and the shareholders thereof. The tax liabilities of 20 transferee shareholders are contingent upon the decision in the principal case. The Commissioner has cross-petitioned as to one of the issues in the principal case and in order to protect an alternate position, has cross-petitioned in 10 of the transferee cases.

The material facts giving rise to this controversy were stipulated by the parties or are not in dispute, and were the subject of extensive findings by the Tax Court. Four wholly-owned subsidiaries of Honolulu owned Wherry Act housing projects [1] which were condemned by the United States pursuant to the provisions of the Capehart Act, 42 U.S.C. § 1594a, on October 30 and November 1, 1957. The projects were located at Biggs Air Force Base, Texas and Ft. Ord, California. The complaints and declarations of taking filed under 40 U.S.C. § 258a recited that the estate being taken consisted of all right, title and interest of the particular Wherry corporation "subject to the interest of" the mortgagees. The Wherries contested the proceedings only with regard to the issue of just compensation. In 1960 and 1962 judgments were entered on jury verdicts which were substantially in excess of the sum of money estimated to be just compensation for the property

1. See 12 U.S.C. § 1748 et seq. This court has previously had occasion to discuss the nature and operation of the "Wherry Act." Sill Corporation v. United States, 10 Cir., 343 F.2d 411, cert: denied, 382 U.S. 840, 86 S.Ct. 88, 15 L.Ed.2d 81; Buena Vista Homes, Inc. v. United States, 10 Cir., 281 F.2d 476.

taken and deposited in court with the declaration of taking.

It was stipulated that subsequent to the dates of the filing of the condemnation complaints and the declarations of takings the Wherries made no further payments to the mortgagees on the notes secured by the condemned properties. Subsequent to the condemnation proceedings the United States entered into agreements with the mortgagees assuming the liabilities of the Wherries on the mortgages. These agreements recited that they were executed "as of December 27, 1957" as to Biggs and El Paso and "as of November 1, 1957" with respect to Ord and Monterey. The Wherry Corporations were not parties to these agreements and refused to sign supplemental agreements submitted by one of the mortgagees evidencing release of their liability as mortgagors.[2] For the fiscal years ending June 30, 1954 through June 30, 1957 Honolulu and its subsidiaries filed consolidated income tax returns. After February 10, 1958 Honolulu ceased to hold 80% of the stock of Ord, Monterey, Biggs and El Paso and was no longer eligible to file consolidated returns with these subsidiaries. Each of these corporations filed separate returns for the period February 11, 1958 to June 30, 1958 and for the fiscal year ending June 30, 1959.

Following disclaimer by the mortgagees, the Wherries withdrew the deposits pursuant to court order in August and September, 1958. In the fiscal years 1958 or 1959 neither the consolidation nor the subsidiaries in their separate returns reported any income resulting from the condemnations. The Commissioner determined that Honolulu and its subsidiaries had realized gain in the fiscal year ending June 30, 1958 in the amount of the excess of the mortgage principal outstanding as of the dates of condemnation over the depreciated cost basis of the Wherries in the properties condemned. The Tax Court sustained this determination and the taxpayers concede their liability, but dispute the date upon which their gain was realized. It is the position of the taxpayers that the United States took the properties as a whole and became liable for just compensation for the entire value of the respective projects without regard to the amount due on the mortgages, and that at the time of taking the United States was not liable for the payment of the mortgages. Consequently, it is said that because the taxpayers were entitled to be paid for the whole property the liability of the United States on the mortgages was not determined at the date of taking and the continued liability of the mortgagors affected their right to compensation. They support this position by a broad attack on the power of the United States to condemn the projects subject to the outstanding mortgages. This issue was not raised in the condemnation proceedings. The sole issue tried there was the amount of the compensation to be paid for the taking of the property. Likins-Foster Monterey Corporation v. United States, 9 Cir., 308 F.2d 595. While this may be a collateral attack upon the condemnation judgment,[3] we are satisfied that by the enactment of the Capehart Act and supplemental legislation, 70 Stat. 682, Congress intended to authorize the United States to condemn Wherry Act projects and to take title to the owner's interest therein subject to existing mortgages. United States v. Certain Interests in Property, etc., 7 Cir., 271 F.2d

2. Counsel for the Wherries was of the opinion that his clients were protected by the agreements and that there was no need to execute separate documents of release. When the supplemental agreements were submitted counsel declined to execute them again because he believed his clients were protected and also because he believed signing the release might compromise his clients' position in the condemnation suits.

3. The Commissioner has not questioned the jurisdiction of the Tax Court to consider this question. See Commissioner of Internal Revenue v. Gooch Co., 320 U.S. 418, 64 S.Ct. 184, 88 L.Ed. 139; Taylor v. Commissioner of Internal Revenue, 2 Cir., 258 F.2d 89.

379, cert. denied, 362 U.S. 974, 80 S.Ct. 1058, 4 L.Ed.2d 1010. The legislative history of the Act contains a summary of the procedure to be followed in determining the sponsor's interest and concludes: "To determine the value of the lessee's interest it would be necessary for the Commissioner to ascertain the difference between the purchase price as determined by him and the principal obligation (the Mortgage), plus accrued interest." In the following paragraph it is stated: "The Secretary of Defense would assume or purchase subject to the balance due under the insured note secured by the Mortgage on such housing and make all future payments thereon. 3 U.S.Code Cong. and Admin.News 1956, page 4552, 84th Cong., 2nd Session. See also the 1956 Amendments, 70 Stat. 1091 at 1112, indicating in the context of other types of condemnations that the measure of compensation is the difference between the outstanding principal obligation plus interest and the price of the property fixed by the court, and thus confirming that it is the equity in Wherry Act housing which is condemned.

■■ We believe a reasonable interpretation of the Act to be that condemnation of the equities was authorized by the statutes, as was done in these cases. The takings were effected under the statutes on the filing of the declarations of taking and making of the deposits. 40 U.S.C. § 258a. As it was obligated to do in such circumstances the Government thereafter made the mortgage payments. It also made the assumption agreements with the mortgagees, as mentioned above. By such assumption of the mortgages with the assent of the mortgagees the Government became directly and primarily liable to the mortgagees. Fitzgerald v. Flanagan, 155 Iowa 217, 135 N.W. 738; Union Stove & Machine Works v. Caswell, 48 Kan. 689, 29 P. 1072, 16 L.R.A. 85. Moreover, such procedure in no way prejudiced the rights of the mortgagors to just compensation for their interests and presented no Constitutional questions. We conclude that such takings of the equities were authorized by the statutes

and not violative of the Fifth Amendment.

■ The law is settled that where mortgaged property is sold and the mortgagor's indebtedness is canceled by the assumption of the mortgage by a third party, the amount of gain realized by the seller is measured by the excess of the outstanding mortgage principal over the seller's basis in the mortgaged property. Int.Rev.Code of 1954, §§ 61(a) (12) and 1001; Crane v. Commissioner, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301; Commissioner of Internal Revenue v. Jacobson, 336 U.S. 28, 69 S.Ct. 358, 93 L.Ed. 477. It is also accepted law that for capital gains purposes, involuntary conversions such as condemnations are treated as "sales or exchanges" under the statute. Kieselbach v. Commissioner, 317 U.S. 399, 63 S.Ct. 303, 87 L.Ed. 358; Hawaiian Gas Products v. Commissioner of Int. Rev., 9 Cir., 126 F.2d 4, cert. denied, 317 U.S. 653, 63 S.Ct. 48, 87 L.Ed. 525. See 3B Mertens, Federal Income Taxation, § 22.100.

■■ In the condemnation proceedings, as provided by 40 U.S.C. § 258a, title to the Wherry projects vested in the United States upon the filing of the declarations of taking and the payment into court of the estimated compensation. Covered Wagon, Inc. v. C. I. R., 8 Cir., 369 F.2d 629; Travis v. United States, 287 F.2d 916, 152 Ct.Cl. 739, cert. denied, 368 U.S. 824, 82 S.Ct. 42, 7 L.Ed.2d 28. The nominal character of the initial deposits in the Texas condemnations did not delay the vesting of title in the United States. United States v. Cobb, 9 Cir., 328 F.2d 115. The date title vested in the United States is also the date the "sale or exchange" necessary for capital gains treatment occurred. Kieselbach v. Commissioner, *supra;* Covered Wagon, Inc. v. C. I. R., supra. See 3B Mertens, *supra*, § 22.103.

■ Except as to Ord, which is discussed in the appendix hereto, we conclude that gains to the mortgagors in connection with the cancellation of their mortgage indebtedness occurred on the

execution of the agreements by the Government to assume the mortgage obligations, together with the release of the mortgagors by the mortgagees. See Riss v. C. I. R., 10 Cir., 368 F.2d 965, 968; Newmark v. C. I. R., 2 Cir., 311 F.2d 913; Clarke v. United States, 94 F.Supp. 543, 548 (E.D.Pa.); and 2 Mertens, Federal Income Taxation, § 11.19. Although the right of the mortgagors to have the Government take over the mortgage obligations existed from the condemnation of the equities, there was no assumption of their mortgage obligations until the agreements were made and resulting gains to the mortgagors did not occur until there was an assumption and a release of their obligations on the mortgages. See Riss v. C. I. R., *supra; cf.* Nitterhouse v. United States, 3 Cir., 207 F.2d 618, cert denied, 347 U.S. 943, 74 S.Ct. 638, 98 L.Ed. 1091. To this extent we disagree with the views of the Tax Court. We treat the details as to the effect of the agreements with respect to the four Wherry corporations in the appendix hereto and there discuss our determinations of the effective dates of the release of the mortgagors on the mortgages, taking into consideration the differences in the agreements. As to Ord, for reasons stated in the appendix, we conclude that the Tax Court on remand should consider the agreement and the surrounding facts and determine when there was an effective release and resultant gain. See Cardwell Investment Co. v. United Supply and Manufacturing Co., 10 Cir., 268 F.2d 857, at 860.

■ The Wherry Corporations commenced liquidation on August 11, 1958 and terminated their existence on August 8, 1959. The taxpayers contend they were entitled to nonrecognition of gain treatment provided by 26 U.S.C. § 337(a) with respect to gain realized on the withdrawal of deposits following the commencement of the liquidation. The Tax Court held that § 337 was not applicable because the properties had not been sold within 12 months following the adoption of their plans of liquidation. The taxpayers challenge this holding asserting that the "sale" required by § 337 was consummated after the adoption of the plan of liquidation when the amount of compensation was determined. Section 337 has no application here because the sale or exchange of the property occurred on the date of the taking by the United States in the condemnation proceedings. The courts have uniformly held that the necessary sale does not occur within 12 months of the adoption of a plan of liquidation where title to the condemned land had vested prior to adoption of the plan. Covered Wagon, Inc. v. C. I. R., *supra;* Dwight v. United States, 2 Cir., 328 F.2d 973; Wendell v. C. I. R., 2 Cir., 326 F.2d 600, and cases cited therein; Rev.R. 59–108, 1 Cum.Bul. 72; *cf.* West Street-Erie Boulevard Corp. v. United States, N.D.N.Y., 294 F.Supp. 145, aff'd in part 2 Cir., 411 F.2d 738; Feinberg v. C. I. R., 8 Cir., 377 F.2d 21.[4]

■ Honolulu as parent of the consolidated group will become liable for the gain realized by the Wherry Corporations as a result of the condemnations in fiscal 1958. Int.Rev.Code of 1954, § 1552(a)(1) and (b); Treas.Regs. § 1.1502–30A. When the Wherries withdrew the escrow deposits in early fiscal 1959, the funds were credited on the books of Honolulu as "Gain on Sale of Assets" and thereafter were alternatively treated as either

4. The taxpayers' reliance on United States v. Morton, 8 Cir., 387 F.2d 441, is obviously misplaced. The Eighth Circuit held that where a plan of liquidation was adopted after a fire loss but before settlement of an insurance claim, the date of sale was the date of claim settlement rather than the date of the fire. The Court expressly adhered to its earlier decision in *Covered Wagon* with respect to an involuntary conversion by condemnation. In addition, the rationale of *Morton* turned on the fact that the amount to be received by way of reimbursement was unascertained prior to adoption of the plan of liquidation, whereas the amount of the deposits sought to be taxed in this case as capital gain was determined either on the date of condemnation or prior to the adoption of the plans of liquidation.

"liquidated dividends" or as a collection on the "chose-in-action" which the Honolulu Corporation was to receive as a result of liquidation. Honolulu now seeks to offset against the 1959 liquidating dividends its 1958 liability·for the taxes owed by the Wherries by treating the Wherries' liability as a retroactive account receivable, thereby substantially reducing its tax liability for the fiscal year ending 1959. The total tax liability of the consolidated group growing out of the condemnation of the Wherry projects was $605,794. The taxpayers assert that Honolulu, which must now pay the tax, may treat it as a retroactive account receivable and offset proportionately the amount of the liquidating dividend paid by each of the Wherries in August and September, 1958. The Tax Court held the liability of the Wherries for taxes would not accrue until the termination of this litigation in which liability is denied and cannot be reflected on Honolulu's 1959 tax return. In disposing of this issue we agree with the following statement of the Tax Court:

"Petitioners argue that since Honolulu is not only liable as a transferee of its former subsidiaries but also because for some years prior to the fiscal year 1959 it filed consolidated returns with these affiliates, the holdings in Arrowsmith v. Commissioner, 344 U.S. 6 [73 S.Ct. 71, 97 L.Ed. 6] (1952), and James Armour, Inc., 43 T.C. 295 (1964), are inapplicable. Any deficiencies in tax which may be determined when the decision of this Court is entered with respect to Monterey and other "Wherry" corporations which Honolulu is required to pay are not a liability which is finally determined until the decision of this Court is entered. It was because. such liability was not fixed or paid until a later year, and not merely because the liability was a transferee liability, that formed the basis of the holding in Arrowsmith v. Commissioner, *supra*, and in *James Armour, Inc.*, *supra*, that the deduction should be taken in the later year. Therefore under the holdings of these cases, Honolulu is not entitled to deduct any amounts of the liabilities of the "Wherry" corporations which it may ultimately be called upon to pay until they are either finally determined or paid. In effect, Honolulu is attempting to obtain a deduction for the yet undetermined taxes of the "Wherry" corporations which it may eventually be called upon to pay by reducing its gain from liquidating distributions from such corporations in the fiscal year 1959 by the yet undetermined amounts."

See also United States v. Consolidated Edison Co., 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356; Security Flour Mills Co. v. Comm'r, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270. The remedial provisions of 26 U.S.C. §§ 1311–1315 have no application.

Likins-Foster Topeka Corporation, a non-Wherry subsidiary, owned in excess of 400 houses in Topeka, Kansas which it rented to the personnel of Forbes Air Force Base. Topeka conveyed the separate units in this project to the four Wherry Corporations about July 1, 1956 and in turn each Wherry sold the parcels which had been deeded to it prior to the end of fiscal 1957. At the time of the transfer each of the Wherries had substantial operating carry-over losses. They took the property subject to existing F.H.A. mortgages but did not assume them. The consideration received by Topeka upon conveyance to the Wherries was substantially less than it would have recieved through sales to third parties. The Tax Court concluded that tax evasion purposes could be inferred from these transactions because the value of the property transferred to each Wherry was approximately equal to the amount of carry-over available to each. Following sale of the houses by the Wherries and receipt of the downpayment and additional payments, the Wherries, having realized a gain which caused them to have income, distributed ·the installment contracts of the purchasers to the parent

corporation as dividends. The significance for tax purposes of this series of transactions is that the Wherries then had income for fiscal 1957 against which net operating loss carry-overs could be offset. The Wherries' carry-overs emanated from years for which each had filed separate returns, and would have expired if not utilized in the fiscal year ending June 30, 1957. Topeka, on the other hand, had no loss carry-overs available to it, and because the Wherries' carry-overs were for years in which separate returns had been filed, the carry-overs were available only to the Wherries and were not otherwise available to the consolidation or other members thereof.[5] Pursuant to 26 U.S.C. § 482, the Commissioner reallocated the total gain from the sales ($472,841) as reported by the Wherries back to Topeka. The purpose of § 482 is to permit the Commissioner to distribute, apportion or allocate gross income, deductions, credits or allowance between organizations or businesses controlled by the same interests to prevent evasion of taxes or to clearly reflect the income of such organizations. W. Braun Co. v. C. I. R., 2 Cir., 396 F.2d 264; Eli Lilly and Company v. United States, 372 F.2d 990, 178 Ct.Cl. 666; Charles Town, Incorporated v. C. I. R., 4 Cir., 372 F.2d 415, cert. denied, 389 U.S. 841, 88 S.Ct. 69, 19 L.Ed.2d 104; Spicer Theatre, Inc. v. C. I. R., 6 Cir., 346 F.2d 704. The Commissioner contends that the Wherries were used only as conduits for the disposition of Topeka's assets in order that the consolidation might receive the benefits of the Wherries' loss carry-overs.

The Tax Court found a tax avoidance purpose and concluded that the Commissioner had the power under § 482 to reallocate the income to Topeka. Taxpayers do not deny a tax avoidance motive, but argue that it is irrelevant since § 482 does not apply to intercompany transactions between consolidated groups which are governed solely by § 1501 et seq. It is argued that the income to be reflected in a consolidated return is the income computed under the consolidation sections; that since the Commissioner has ruled that transfers between components of a consolidation are not transfers resulting in gain or loss, there is no income to be allocated under § 482. The Government counters urging that since the regulations, § 1.482.1(b) (2), providing that § 482 applies in the case of any controlled taxpayer, "whether such taxpayer makes a separate or a consolidated return", have been continued without change through several reenactments of the I. R. C., the regulations are deemed to have been given Congressional approval.[6]

---

5. Under the consolidated regulations, net operating loss carry-overs from separate return years are available to a consolidation only as offsets against the income of the affiliate which actually experienced the preconsolidation loss. Treas.Regs., § 1.1502–31A(b) (3); see Phinney v. Houston Oil Field Material Company, 5 Cir., 252 F.2d 357.

6. Section 1.482–1(b) is as follows:
"(1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

Aside from the various legal niceties, it seems apparent that the taxpayer should not be allowed to prevail on the basis of form over substance. It is true that 26 U.S.C. § 1501 et seq. governs consolidated returns. However, § 1502 expressly delegates power to promulgate regulations to assure a proper reflection of income. One of those regulations—which is not challenged by the taxpayer—provides that preconsolidation loss carry-overs can be offset only against the specific affiliate that incurred the loss. Whether this is accomplished by a direct transfer of loss carry-overs from the loss corporation to the consolidation to offset the group's income (specifically prohibited and recognized as prohibited by the taxpayers) or whether this is accomplished by transferring group income to the loss corporation (the method employed here) should make little difference. In either case, the result works the same tax distortion and cannot be sustained.

■ The final issue raised here arisers out of a cross-appeal by the Commissioner from an adverse decision of the Tax Court concerning distributions during the fiscal year 1956 to Honolulu by two of its subsidiaries which distributions were in excess of Honolulu's basis in the stock of the distributing corporations.[7] At the time of the distributions, the subsidiaries making the distributions had no earnings or profits. Consequently, payments were not dividends as defined by 26 U.S.C. § 316(a). Non-dividend distributions "shall be applied against and reduce the adjusted basis of the stock." 26 U.S.C. § 301(c) (2). The difficulty arises here because the parent had already received the amount of its basis in the stock. The Tax Court concluded that although the distributions were not dividends, they were "intercompany transactions" under Treasury Regulations 1.1502–31A(b) (2) (iii) (a) and eliminated from income of the parent corporation which received it for the purpose of making a consolidated return. The Commissioner's contention is that the distributions in excess of Honolulu's basis in the stock of the subsidiaries are taxable under § 301(c) (3)[8] and that the consolidated return regulations do not provide for their elimination from income. It is argued that because of the permanent tax avoidance resulting from the Tax Court's decision the regulations relating to treatment of capital gain in intercompany transactions should not be applied. Specifically, the Commissioner contends that no carry-over basis existed which would reflect gain upon the sale of the property to an outsider.[9] The Tax Court was of the opinion that there was only a possibility that the distributions

---

"(2) Section 482 and this section apply to the case of any controlled taxpayer, whether such taxpayer makes a separate or a consolidated return. If a controlled taxpayer makes a separate return, the determination is of its true separate taxable income. If a controlled taxpayer is a party to a consolidated return, the true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer are determined consistently with the principles of a consolidated return."

7. It is without dispute that the distributions were with respect to stock as provided by § 301(a), I.R.C.1954, and that § 301(c) applies in the absence of a controlling provision of the consolidated regulations.

8. 26 U.S.C. § 301(c) (3) is as follows:
   "*Amount in excess of basis.*—(A) In general.—Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property."

9. It appears that the Commissioner's new regulation treating this subject, § 1.1502–14(a) (2), would postpone recognition of the income resulting from non-dividend distribution by recording it in an "excess loss account" which is applied to the parent's income when the stock in the subsidiary is sold, or when the affiliation of the subsidiary with the consolidated group is terminated. § 1.1502–19 (a) and (b).

had or would escape taxation. In this connection the Court said:

"Expressed another way, to the extent that the cash which was distributed to the parent was accumulated by the subsidiaries during consolidated years, it very likely has in some way been taxed as an overall part of the consolidation. The fact that respondent in connection with redemption of stock issued a specific regulation which we will subsequently discuss, does not justify reaching a conclusion specifically contrary to another portion of his regulations where he has not chosen to change those regulations."

Relying on American Water Works Co. v. Commissioner of Int. Rev., 2 Cir., 243 F. 2d 550, the Court also concluded that the reduction in basis of the stock of the subsidiaries in the hands of the parent prevented tax avoidance. It is recognized that the Commissioner's treatment would be correct in the normal non-consolidation situation. However, the consolidation sections provide for nonrecognition of gain on intercompany transactions:

"There shall be eliminated unrealized profits and losses in transactions between members of the affiliated group and dividend distributions from one member of the group to another. * * *" (§ 1.1502–31A(b) (1) (i))

Thus, the Tax Court holding that the regulations expressly eliminate capital gain transactions between affiliates must be upheld.

The decision of the Tax Court in these consolidated cases is modified as stated herein and the cases are remanded for further proceedings and recomputation of the tax liabilities involved in accordance with this opinion and the appendix thereto.

## APPENDIX

The four Wherry corporations involved were Monterey, Biggs, El Paso and Ord. Separate three-party agreements were executed pertaining to the obligations of each on its note and mortgage. They were executed by the military department involved, the Federal Housing Administration and the bank or insurance company holding the mortgage. These agreements will be considered separately.

*Monterey:* The agreement recites that it was entered into as of November 1, 1957. However, it was acknowledged by the Assistant Commissioner for Operations of the Federal Housing Administration on July 8, 1958. The agreement contemplated execution by three interested parties. We conclude that the assumption and release agreement was effective for the purposes of this case on July 8, 1958, the completion of its execution. See Kent Homes, Inc. v. United States, 279 F.Supp. 650, 655 (D.Kan.1967).

The agreement provided that the Government assumed the obligations of the note and mortgage. It also stated that the parties agreed that the mortgagor was released from all further liability and obligation on the note and mortgage. For tax purposes we conclude that the gain of Monterey in connection with the discharge of the mortgage indebtedness occurred on July 8, 1958.

*Biggs and El Paso:* Except for an immaterial difference in dates that may exist in the last acknowledgment, the two separate agreements relating to Biggs and El Paso read alike. The acknowledgment by the Assistant Commissioner for Operations of the Federal Housing Administration was made in January, 1958, for both agreements, the exact date being illegible. We conclude that the agreements relating to Biggs and El Paso were effective for tax purposes in January, 1958, the completion of their execution.

The agreements both contained the following provision, with a difference in amount of the omitted indebtedness being stated in each:

## ". . ARTICLE I

### ASSUMPTION AND RELEASE AGREEMENT

It is agreed by the parties hereto that the Department assumes the obligation of and will make the payments

called for under the terms and provisions of the mortgage and note hereinbefore referred to and the Mortgagee agrees to accept the obligation of the Department to make such payments and the mortgagee and the Department hereby agree that the unpaid principal balance of said mortgage note on the day immediately preceding the effective date of this agreement is $————. The Department and the Commissioner agree that, without affecting liability of the Department under the foregoing assumption, the Mortgagee may release Likins Foster * * * Corporation, the original mortgagor, from liability in connection with the said note and the mortgage and chattel mortgage securing the payment of said note. * * * "

We note that the mortgagee agrees to accept the obligation of the Government and the indication of intent to release the mortgagors in the caption of the article as well. While there is not the clear release as there was to Monterey, we believe a release of the mortgagors was intended. On the basis of Article I and the entire agreements we conclude that they effected an assumption of the mortgage indebtednesses of Biggs and El Paso by the Government and a release by the mortgagee of their personal liability on the notes. We conclude that the gains of Biggs and El Paso in connection with the discharge of their mortgage indebtednesses occurred in January, 1958.

*Ord:* In the case of Ord the significant provision of the three-party agreement reads as follows:

". . ARTICLE I

ASSUMPTION AND RELEASE

That the Department does hereby assume the obligation of, and will make the payments prescribed by and in accordance with the terms and provisions of, said deed of trust and the note secured thereby relating to principal, interest, and mortgage insurance premiums (beginning with the payment due November 1, 1957) ; that the Mortgagee and the Commissioner do hereby accept the obligation of the Department to make such payments, ~~and that the Department, the Commissioner, and the Mortgagee do hereby agree that the aforesaid mortgagor is released from all further liability and obligation under said mortgage and the note secured thereby~~. This undertaking by the Department shall be without prejudice to the Government's position in said condemnation proceeding with respect to the prorating of such payment obligation with the mortgagor for any period during which any payment or part thereof is allocable to any period prior to the date of the filing of the Declaration of Taking. * * * " [1]

In view of the deleted language concerning the release of the mortgagor, Ord, we doubt that we should now hold as a matter of law that the agreement alone released Ord. We feel instead that we should leave this determination to be made first by the Tax Court on remand. There, the agreement and all the facts may be considered and the determination made from the record as to when an effective release of Ord by the mortgagee occurred, and thus, when a gain by discharge of the mortgage indebtedness may have resulted. See Cardwell Investment Co. v. United Supply and Manufacturing Co., 10 Cir., 268 F.2d 857, at 860. In this connection we note that when the liquidation resolution of the corporation was adopted on August 11, 1958, the minutes recognized that the corporation had been relieved of its mortgage indebtedness by the three-party agreement. At least by this date the record shows that there was a course of conduct and mutual under-

[1]. The deleted language reads as follows:
   " * * * and that the Department, the Commissioner, and the Mortgagee do hereby agree that the aforesaid mortgagor is released from all further liability and obligation under said mortgage and the note secured thereby. * * * "

standing between the parties to justify an inference that the obligation of the mortgagors had been extinguished. The mortgagee had agreed to the assumption of the mortgage by the United States, accepted the mortgage payments from it, and did not object to the liquidation of Ord.