J. A. TOBIN CONSTRUCTION COMPANY, PETITIONER *V.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10063–82.     Filed December 18, 1985.

*Richard S. Managhan* and *Ernest M. Fleischer*, for the
petitioner.

*Alan V. Jacobson*, for the respondent.

SWIFT, *Judge*: Respondent determined a deficiency in peti-
tioner's Federal income tax liability for the year 1975 in the
amount of $306,958.67. The parties have reached a partial
settlement and the remaining issues for the Court to decide
concern the loss carryback and loss carryforward rules of the
consolidated return regulations and the validity of certain
adjustments made under section 482[1] for imputed interest
income.

Although the tax deficiency involved herein pertains only to
the Federal corporate income tax liability of J.A. Tobin
Construction Co., Inc. (Tobin Construction) for 1975, the issues
in this case arise out of certain corporate reorganizations
involving Tobin Construction and three affiliated corporations
which occurred in 1975, 1976, and 1977, and the extent to

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in
effect during the year in issue.

which loss carrybacks and loss carryforwards of the affiliated corporations are available to reduce Tobin Construction's taxable income for 1975. Similarly, our decision on the section 482 issue, which directly involves 1977 and 1978, will affect the amount of net operating losses that will be available as a carryback to offset Tobin Construction's 1975 taxable income.

FINDINGS OF FACT

Some of the facts were stipulated and are so found.

Tobin Construction timely filed its Federal corporate income tax return for 1975. Tobin Construction was a Missouri corporation doing business in Kansas and Missouri at the time it filed its petition herein. Its corporate headquarters were located in Kansas City, Kansas.

Tobin Construction was formed in 1928 as a closely held, family owned construction company. In 1974 and for a number of years prior thereto, Joseph Tobin (Joseph) and his sister Patricia A. O'Rourke (Patricia) each owned 50 percent of the stock of Tobin Construction.

Rosedale Development Co., Inc. (Rosedale) also was a construction and real estate development company owned by members of the Tobin family. Rosedale was incorporated on May 2, 1924, and in 1974 the stock of Rosedale was owned 30 percent by Patricia and 70 percent by her mother, Mrs. F.M. Tobin.

In 1975, Patricia initiated negotiations with Joseph concerning the ownership and operations of Tobin Construction that might lead to her children's becoming involved with the management of the company. As a result of the negotiations, Joseph agreed to sell his entire stock interest in Tobin Construction to a corporation wholly owned by Patricia.

To accomplish her indirect acquisition of Joseph's stock in Tobin Construction, Patricia, on the advice of her attorneys, utilized a corporation by the name of Three Central United, Inc. (Three Central). On December 9, 1975, Patricia exchanged her 50-percent stock interest in Tobin Construction for all of the common stock of Three Central. On the same day, Three Central purchased all of Joseph's stock in Tobin Construction for $2.9 million in cash. As a result of those two transactions, Patricia became the sole shareholder of Three Central, and Three Central became the sole shareholder and parent of

Tobin Construction. On December 17, 1975, the name of Three Central was changed to O'Rourke Bros.

The corporate history of Three Central (i.e., O'Rourke Bros.) prior to its utilization to acquire the stock of Tobin Construction is important in this case. Prior to late 1975, Three Central had been a "shelf" corporation. It was incorporated by a Kansas City law firm on July 15, 1974, as a Missouri corporation. Members of the law firm were designated as the shareholders, officers, and directors of Three Central solely to comply with Missouri corporation law. No business was conducted by Three Central, and its corporate status simply was maintained by the law firm in good standing until and if a client of the law firm needed a new corporate vehicle for the transaction of business being handled by the law firm. Three Central had conducted no economic activity and had total assets of $1.

As mentioned, in December of 1975, Three Central was utilized by Patricia to acquire all of her stock and all of Joseph's stock in Tobin Construction. To make Three Central a suitable corporate vehicle for the acquisition of Tobin Construction, a number of changes were necessary in its corporate structure shortly prior to the contemplated stock acquisition. On November 19, 1975, Three Central applied to the State of Missouri to change its name to O'Rourke Bros, Inc. It opened a bank account and applied for a bank loan of $2.9 million in order to fund the purchase of Joseph's stock in Tobin Construction.

On November 28, 1975, the three outstanding shares of common stock of Three Central were redeemed, and 100 shares of common stock were issued to Patricia in exchange for all of her stock in Tobin Construction. A new board of directors was elected, and Patricia and members of her family were elected to the board. Patricia also was elected president and treasurer of the corporation. As mentioned, the name of Three Central was changed to O'Rourke Bros., Inc. (O'Rourke), on December 17, 1975.

On December 31, 1975, O'Rourke declared a stock dividend pursuant to which Patricia received 4 shares of common stock for each share she owned. Thus, on December 31, 1975, Patricia was the sole shareholder of O'Rourke with 500 shares

of its common stock, and O'Rourke was the sole shareholder of Tobin Construction.

On March 9, 1976, there was filed on behalf of O'Rourke and Tobin Construction a joint application for an automatic extension of time to file a consolidated Federal corporate income tax return for 1975. On June 14, 1976, however, there was filed on behalf of O'Rourke and Tobin Construction, separate Federal corporate income tax returns for 1975. On Tobin Construction's 1975 return, the statement was made that, "Taxpayer and its parent subsequently decided against filing a consolidated Federal income tax return for 1975." That decision apparently was made because petitioner's representatives thought that the filing of a consolidated return for 1975 would have required the preparation of a separate return for Tobin Construction for the period January 1, 1975, to December 8, 1975, due to the acquisition of Tobin Construction on December 9, 1975. Since O'Rourke realized a net operating loss for 1975 of only $13,918, which could be carried forward to 1976, the representatives of O'Rourke and Tobin Construction decided against filing a consolidated return for 1975.

On its 1975 separate corporate Federal income tax return, Tobin Construction reflected taxable income of $1,869,307. Rosedale, on its 1975 separate corporate Federal income tax return, reflected a net operating loss of $171,730.

In 1976, O'Rourke acquired ownership of two additional corporations, P.M. Divide Mining Co. (Divide) and Rosedale. Divide was incorporated on June 3, 1976, as a Missouri corporation to engage in a coal mining venture. On June 27, 1976, O'Rourke acquired all 125 shares of the common stock of Divide for the total amount of $125.

On December 31, 1976, O'Rourke acquired all of the stock of Rosedale by exchanging 81 shares of the common stock of O'Rourke for all of the outstanding shares of Rosedale owned by Patricia and by exchanging 13,000 shares of preferred stock of Rosedale for all of the outstanding stock of Rosedale owned by Mrs. F.M. Tobin.

For 1976, Tobin Construction, O'Rourke, and Divide filed a consolidated Federal corporate income tax return and reflected thereon the following separate income and loss figures and consolidated taxable income as indicated:

|  | 1976<br>*Taxable income or loss* |
|---|---|
| Tobin Construction ................................................. | $1,564,588 |
| O'Rourke............................................................ | (244,003) |
| Divide............................................................... | 0 |
| 1976 Consolidated taxable income ............................... | 1,320,585 |

Rosedale filed a separate Federal corporate income tax return for 1976, reflecting a taxable income of $79,929.

For 1977 and 1978, Tobin Construction, O'Rourke, Divide, and Rosedale filed consolidated Federal corporate income tax returns reflecting the following separate income and loss figures and consolidated net operating losses:

|  | 1977<br>*Taxable income<br>or loss* | 1978<br>*Taxable income<br>or loss* |
|---|---|---|
| Tobin Construction | ($256,431) | ($923,729) |
| O'Rourke | (195,891) | (200,660) |
| Divide | (107,220) | (78) |
| Rosedale | 20,581 | 14,785 |
| Consolidated net operating losses | (538,961) | (1,109,682) |

The consolidated net operating losses, as reported on the consolidated Federal corporate income tax returns filed by Tobin Construction, O'Rourke, Divide, and Rosedale for 1977 and 1978, were carried back to the separate return of Tobin Construction for 1975 and to the consolidated return of Tobin Construction, O'Rourke, and Divide for 1976 as follows:

CARRYBACKS OF NOLs CLAIMED ON THE CONSOLIDATED
1977 AND 1978 FEDERAL INCOME TAX RETURNS

| NOLs | | CARRIED BACK TO: | |
|---|---|---|---|
| *1977 Consolidated<br>NOL carryback* | *1978 Consolidated<br>NOL carryback* | *1975 Separate<br>return of<br>Tobin Construction* | *1976 Consolidated return<br>of Tobin Construction,<br>O'Rourke and Divide* |
| $538,961 | | ($254,260) | ($284,701) |
| | [2]$1,109,681 | (917,773) | (191,908) |

Rosedale claimed a net operating loss of $171,730 on its separate Federal corporate income tax return for 1975. That net operating loss for 1975 was carried forward by Rosedale to

---

[2]The record herein does not explain the $1 discrepancy between the 1978 consolidated net operating loss ($1,109,682) and the amount carried back ($1,109,681).

its separate return for 1976 and to the separate taxable income of Rosedale for 1977 as reflected on the 1977 consolidated Federal income tax return of Tobin Construction, O'Rourke, Divide, and Rosedale as follows:

| NOL | CARRIED FORWARD TO: | |
| --- | --- | --- |
| | *1976 Separate return of Rosedale* | *Separate income of Rosedale on 1977 consolidated return of Tobin Construction, O'Rourke, Divide, and Rosedale* |
| *1975 Separate NOL of Rosedale* ($171,730) | $79,929 | $91,801 |

During the years 1975, 1976, 1977, and 1978, Tobin Construction transferred funds to O'Rourke on a monthly basis which funds O'Rourke used to pay operating expenses and to make payments on the $2.9-million bank loan that O'Rourke had obtained to purchase Joseph's stock in Tobin Construction. The transfers to O'Rourke were reflected on Tobin Construction's books and financial statements as loans to O'Rourke.

O'Rourke made no repayment of any of the funds transferred to it by Tobin Construction except that two tax refunds (that apparently were attributable to O'Rourke's losses as reflected on the consolidated returns) were treated on the intercompany books as payments to Tobin Construction in partial repayment by O'Rourke of some of the funds O'Rourke had received from Tobin Construction. Typically, the balance of the receivable account on Tobin Construction's books with respect to funds it had transferred to O'Rourke was reduced by the declaration of cash dividends by Tobin Construction in favor of O'Rourke. No actual payment of dividends occurred. In order to fulfill its obligation to pay dividends declared, Tobin Construction simply would debit its dividends payable account reflecting dividends owed to O'Rourke and credit its receivable account reflecting amounts that previously had been transferred to O'Rourke and that had been accounted for by Tobin Construction as loans to O'Rourke.

Reflected below are the amount of funds transferred each year in this manner by Tobin Construction to O'Rourke, the tax refunds attributable to O'Rourke that were treated as having been transferred by O'Rourke to Tobin Construction, the cash dividends declared each year by Tobin Construction

(which were used to reduce the receivable account of O'Rourke in favor of Tobin Construction), and the balance at the end of each year of the funds transferred by Tobin Construction to O'Rourke:

|  | Funds transferred | Tax refunds debited to Tobin Construction | Dividends declared | Yearend balance of funds transferred |
|---|---|---|---|---|
| 1975 | – – – – – – – – – – – – not in the record – – – – – – – – – – – |  |  |  |
| 1976 | $872,274 | $122,000 | 0 | $750,274 |
| 1977 | 612,093 | 0 | $750,000 | 612,367 |
| 1978 | 579,933 | 72,500 | 600,000 | 519,800 |

The funds transferred by Tobin Construction to O'Rourke were not evidenced by written promissory notes. No interest was due on the funds. No repayment or maturity dates were fixed. In a footnote to petitioner's financial statements during the years in issue, the following statement was made with respect to the funds transferred:

Tobin Construction is a wholly-owned subsidiary of O'Rourke which has required cash advances from Tobin Construction in order to fund certain operations and service its debt. Such advances are shown in the balance sheet as a receivable due from the parent. Further advances may be required in the future for these purposes. It is Tobin Construction's intention to declare cash dividends during [the years in question] to the parent, if the parent is unable to meet its obligations.

OPINION

*Carryback of O'Rourke's Portion
of the 1977 and 1978 Consolidated NOLs
to Tobin Construction's 1975 Separate Return*

Petitioner seeks to carry back the portion of the consolidated net operating losses for 1977 and 1978 attributable to O'Rourke to offset Tobin Construction's 1975 taxable income. Petitioner asserts that even though a consolidated return was not filed for 1975 by Tobin Construction and O'Rourke, it was intended for those two companies to file a consolidated return, and they failed to do so only because of a mistake of law or fact, or inadvertence. Under any of those circumstances, petitioner contends that a consolidated return will be deemed

to have been filed for 1975 by Tobin Construction and O'Rourke. Petitioner cites section 1.1502–75(b)(3), Income Tax Regs., as authority. In the alternative, petitioner contends that O'Rourke was a member of the consolidated group "immediately after its organization" and that therefore, under section 1.1502–79(a)(2), Income Tax Regs., O'Rourke's net operating losses from 1977 and 1978 can be carried back to separate return years of other members of the consolidated group.

Respondent disagrees with petitioner's arguments primarily on factual grounds. Respondent contends that petitioner's failure to join in the filing of a consolidated return with O'Rourke for 1975 was intentional and was not due to a mistake of law or fact, or inadvertence. With regard to petitioner's alternative argument, respondent contends that O'Rourke was not a member of the consolidated group immediately after its organization and that since O'Rourke filed a separate return for 1975, its net operating losses for 1977 and 1978 cannot be carried back to Tobin Construction's 1975 separate return year. For the reasons explained below, we agree with respondent on both arguments.

With regard to petitioner's first argument, section 1.1502–75(b)(3), Income Tax Regs., does provide that where the failure to join in the filing of a consolidated return is due to a mistake of law or fact, or inadvertence, a consolidated return will be deemed to have been filed.[3] Petitioner asserts that its accountants were under the misapprehension that the acquisition by Patricia of O'Rourke and the acquisition by O'Rourke of Tobin Construction did not qualify as a reverse acquisition. Had the accountants realized that the reorganization did qualify as a reverse acquisition, petitioner argues that a consolidated return would have been filed under the authority of section 1.1502–75(d), Income Tax Regs. This argument fails because even if the acquisition of O'Rourke did not qualify as a

---

[3]Sec. 1.1502–75(b)(3), Income Tax Regs., provides as follows:

(3) *Failure to consent due to mistake.* If any member has failed to join in the making of a consolidated return under either subparagraph (1) or (2) of this paragraph, then the tax liability of each member of the group shall be determined on the basis of separate returns unless the common parent corporation establishes to the satisfaction of the Commissioner that the failure of such member to join in the making of the consolidated return was due to a mistake of law or fact, or to inadvertence. In such case, such member shall be treated as if it had filed a Form 1122 for such year for purposes of paragraph (h)(2) of this section, and thus joined in the making of the consolidated return for such year.

reverse acquisition, a consolidated return still could have been filed by Tobin Construction and O'Rourke for part of 1975 under the consolidated return rules. See secs. 1501 and 1502 and the regulations thereunder. Thus, any mistake as to whether the acquisition qualified as a reverse acquisition was not a reason for not filing a consolidated return for at least part of 1975.

Petitioner argues that a mistake of fact occurred that was responsible for a consolidated return not being filed. The only mistake of fact that occurred was the failure of petitioner's representatives to predict more accurately the future income and loss picture of the consolidated group. Errors in tax planning with respect to subsequent years' earnings and profits and tax liabilities arising therefrom surely do not rise to the level of a mistake of fact as contemplated by section 1.1502–75(b)(3), Income Tax Regs. See *Grynberg v. Commissioner*, 83 T.C. 255, 262–263 (1984); *Estate of Stamos v. Commissioner*, 55 T.C. 468, 474 (1970).

Petitioner also argues that the failure to file a consolidated return for 1975 was due to inadvertence. The testimony in this case is quite clear that petitioner's representatives considered filing a consolidated return for 1975 but affirmatively chose not to do so. The separate return for O'Rourke for 1975 was filed consciously and intentionally, and without inadvertence.

Although not entirely clear from petitioner's briefs, petitioner also apparently argues that a mistake of law occurred due to the failure of petitioner's representatives to realize that under section 1.1502–75(d), Income Tax Regs., Tobin Construction and O'Rourke could have filed a consolidated return for the entire 12 months of 1975 which, petitioner contends, would have been done if the representatives had realized that the acquisition of O'Rourke and its acquisition of the stock of Tobin Construction qualified as a reverse acquisition. To the extent petitioner does make that argument, it also must be rejected. Even if a mistake of fact or law, or inadvertence occurred, by its express terms the relief provision of section 1.1502–75(b)(3), Income Tax Regs., applies only to the situation where a consolidated return is filed by some members of the consolidated group (for the year for which relief is sought— namely, 1975 herein) and where the mistake causes one or more of the other members of the group to fail to join in the

consolidated return that was filed. See *Lion Associates, Inc. v. United States*, 515 F. Supp. 550 (E.D. Pa. 1981). Here, no consolidated return was filed by any member of the consolidated group for any portion of 1975, and section 1.1502–75(b)(3), Income Tax Regs., is not applicable.

Petitioner makes the alternative argument that if O'Rourke is not deemed to have filed a consolidated return with Tobin Construction for 1975 under section 1.1502–75(b)(3), Income Tax Regs., the portion of the 1977 and 1978 consolidated net operating losses attributable to O'Rourke can be carried back to Tobin Construction's separate return for 1975 under the authority of section 1.1502–79(a)(2), Income Tax Regs. That regulation provides, among other things, that the portion of a consolidated net operating loss attributable to a particular corporation will be allowed as a carryback to a separate return of another member of the affiliated group if the corporation to whom the net operating loss in question is attributable was not yet organized in the separate return year in question and if that corporation became a member of the group immediately after its organization.[4] As part of its argument, petitioner asserts that during the period from July 15, 1974, to December 9, 1975, O'Rourke was an inactive "shelf" corporation and that O'Rourke should not be considered to have been in existence during that period. Also, petitioner cites section 1.1502–76(b)(5), Income Tax Regs., and argues that any period of time less than 30 days (namely, the 23 days from December 9, 1975, through December 31, 1975) may be ignored for purposes of the consolidated return regulations.[5] Based on the

---

[4]Sec. 1.1502–79(a)(2), Income Tax Regs., provides—

(2) *Nonapportionment to certain members not in existence.* Notwithstanding subparagraph (1) of this paragraph, the portion of a consolidated net operating loss attributable to a member shall not be apportioned to a prior separate return year for which such member was not in existence and shall be included in the consolidated net operating loss carrybacks to the equivalent consolidated return year of the group (or, if such equivalent year is a separate return year, then to such separate return year), provided that such member was a member of the group immediately after its organization.

[5]Sec. 1.1502–76(b)(5), Income Tax Regs., provides—

(5) *Period of 30 days or less may be disregarded.* For purposes of the regulations under section 1502—

(i) If within a period of 30 days after the beginning of a corporation's taxable year (determined without regard to the required change to the parent's taxable year) it becomes a member of a group which files a consolidated return for a taxable year which includes such period, then such corporation may at its option be considered to have become a member of the group as of the beginning of the first day of such corporation's taxable year, or

(ii) If, during a consolidated return year of a group, a corporation (other than a corporation

above arguments, petitioner asserts that O'Rourke should not be considered to have been organized and in existence until January 1, 1976, by which date it had become a part of the affiliated group. If correct, that argument would allow O'Rourke to carry back its portion of the 1977 and 1978 consolidated net operating losses to the 1975 separate return year of Tobin Construction.

Again, we must reject petitioner's argument. An inactive corporation is considered to be in existence for purposes of section 1.1502–79(a)(2), Income Tax Regs., from the date of its incorporation. *Braswell Motor Freight Lines, Inc. v. United States*, an unreported case (N.D. Tex. 1972, 30 AFTR 2d 72–5608, 72–2 USTC par. 9675), affd. 477 F.2d 594 (5th Cir. 1973), cert. denied 414 U.S. 1143 (1974).[6] Thus, O'Rourke (under its prior name of Three Central United) is considered to have been in existence from July 15, 1974. Because it was not a member of the affiliated group immediately after its organization, the portion of the 1977 and 1978 consolidated net operating losses attributable to O'Rourke cannot be carried back to the separate return of Tobin Construction for 1975.

With regard to petitioner's argument that the 23 days in December of 1975, during which O'Rourke was active, can be disregarded, we note that section 1.1502–76(b)(5), Income Tax Regs., expressly applies only to days that occur during a year for which a consolidated return is filed. Since Tobin Construction and O'Rourke filed separate returns for 1975, petitioner's reliance on that regulation is misplaced.

The facts of *Electronic Sensing Products, Inc. v. Commissioner*, 69 T.C. 276 (1977), are very similar to the facts of this case on this issue. A subsidiary was organized on October 6, 1972. The parent corporation and the subsidiary filed separate returns for their taxable periods ended October 31, 1972. Because the subsidiary was in existence in 1972 and because it filed a separate return for its short taxable year ended October 31, 1972, the portion of the consolidated net operating losses in

---

created or organized in such year by a member of the group) has been a member of such group for a period of 30 days or less, then such corporation may at its option be considered as not having been a member of the group during such year.

[6]For purposes of sec. 1.1502–79(a)(2), Income Tax Regs., respondent apparently will not count a period of corporate inactivity immediately following incorporation if a request under sec. 1.6012–2(a)(2), Income Tax Regs., is filed for permission not to file corporate income tax returns for the period of inactivity. See Crestol, Hennessy & Rua, The Consolidated Tax Return, par 5.02 at 5–52 (1983).

a subsequent year that was attributable to the subsidiary could not be carried back to the separate return of the parent corporation ended October 31, 1972. *Electronic Sensing Products, Inc. v. Commissioner, supra* at 282–283; see also sec. 1.1502–79(a)(4), example (*1*), Income Tax Regs.; *Jim Burch & Associates, Inc. v. Commissioner,* 76 T.C. 202 (1981). The fact that O'Rourke existed in 1975 and filed a separate return for 1975 is fatal to petitioner's argument that section 1.1502–79(a)(2), Income Tax Regs., authorizes the portion of the 1977 and 1978 consolidated net operating losses attributable to O'Rourke to be carried back to Tobin Construction's separate return for 1975.

### *The Carryback of Divide's Portion of the 1977 and 1978 Consolidated NOLs to Tobin Construction's 1975 Separate Return*

Since Divide was a member of the affiliated group immediately after its organization in 1976, petitioner argues that Divide's portion of the 1977 and 1978 consolidated net operating losses can be carried back to Tobin Construction's 1975 separate return.

As we have previously discussed, section 1.1502–79(a)(2), Income Tax Regs., provides, among other things, that if a loss member of an affiliated group was a member of the group immediately after its organization, the portion of a consolidated net operating loss attributable to that member can be carried back to a separate return of other members of the group. The regulation, however, is silent as to which member of the affiliated group is entitled to the carryback in the separate return year.

Petitioner asserts that Divide's portion of the 1977 and 1978 consolidated net operating losses should be carried back to Tobin Construction's 1975 separate return. Tobin Construction is, of course, a sister corporation of Divide. Respondent counters that Divide's portion of that consolidated net operating loss only can be carried back against O'Rourke's 1975 separate return. O'Rourke, of course, is the parent of Divide.

There is limited authority discussing this issue. In Rev. Rul. 74–610, 1974–2 C.B. 288, respondent states that the portion of a consolidated net operating loss attributable to a second tier subsidiary should be carried back to the separate return of the

immediate parent corporation, not to the separate return of the common parent. The rationale for that holding was that the assets of the second tier subsidiary (i.e., the loss member) previously had been owned by the immediate parent corporation and but for the formation of the second tier subsidiary, the immediate parent (i.e., the first tier subsidiary) would have sustained the losses in the consolidated return year and the losses would have been carried back to the separate return of the immediate parent.

References to this issue in 8A J. Mertens, Law of Federal Income Taxation, sec. 46.104, at 131 (1985 rev.), and in J. Crestol, K. Hennessey & A. Rua, Consolidated Tax Return, par. 5.02 (iv), at 5–51 (3d ed. 1980), state that the immediate parent corporation will be allowed the carryback loss and no reference is made to a "but-for" test. In F. Peel, Consolidated Tax Returns, sec. 9:06, at 9–30 (3d ed. 1984), it is stated that ordinarily the carryback will be to the separate return year of the immediate parent corporation and the further explanation is given that—

The principle that has developed is that the carryback is to the member that would have sustained the loss if the loss subsidiary had not been incorporated.

Petitioner argues that Tobin Construction, not O'Rourke, funded the operations and the acquisition of Divide and that, but for the existence of Divide, Tobin Construction would have incurred the net operating losses Divide incurred in 1977 and 1978. Petitioner therefore argues that those losses should be carried back to the 1975 separate return of Tobin Construction.

It is our opinion that in most situations involving this issue, a subsidiary corporation's portion of a consolidated net operating loss should be carried back to the separate return of the subsidiary's immediate parent corporation. We will not attempt to describe potential exceptions to that rule for we are not faced with an exception here. Although O'Rourke did receive some funds from Tobin Construction that were lent by O'Rourke to Divide, that fact does not establish an adequate basis to allocate the loss carryback in question to the 1975 separate return of Tobin Construction. O'Rourke was a viable corporate entity that was formed for valid business purposes.

It formed a new corporation (namely, Divide). It acquired two corporations (namely, Tobin Construction and Rosedale), and it filed a separate tax return for 1975. On the facts presented to us, there is no basis to allow a carryback of Divide's portion of the 1977 and 1978 consolidated net operating losses to the 1975 separate return of Tobin Construction.

### The Carryforward of Rosedale's 1975 Separate Return Loss To Reduce Its Separate Taxable Income in 1977

Petitioner seeks to carry forward a loss of $91,801 from Rosedale's 1975 separate return to Rosedale's 1977 separate taxable income computation, thereby increasing the 1977 consolidated net operating loss that is available as a carryback to the 1975 separate return of Tobin Construction. Section 1.1502–21(c)(2), Income Tax Regs., allows a carryforward of a loss from a separate return limitation year (i.e., Rosedale's 1975 separate return year) to a consolidated return year where, among other things, there exists consolidated net taxable income in the carryforward year before the loss carryforward in question is applied. That regulation provides as follows:

(c) Limitation on net operating loss carryovers and carrybacks from separate return limitation years—

\*        \*        \*        \*        \*        \*        \*

(2) *Computation of limitation.* The amount referred to in subparagraph (1) of this paragraph with respect to a member of the group is the excess, if any, of—
  (i) Consolidated taxable income (computed without regard to the consolidated net operating loss deduction), minus such consolidated taxable income recomputed by excluding the items of income and deduction of such member, over
  (ii) The net operating losses attributable to such member which may be carried to the consolidated return year arising in taxable years ending prior to the particular separate return limitation year.

Section 1.1502–21(c), Income Tax Regs., was promulgated under the specific authority of section 1502. Furthermore, the regulation has been upheld by each court that has considered its validity or its application. See *Wolter Construction Co. v. Commissioner*, 68 T.C. 39, 48 (1977), affd. 634 F.2d 1029 (6th

Cir. 1980). Addressing the predecessor regulation in *Foster v. Commissioner*, T.C. Memo. 1966–273, remanded on another issue sub nom. *Likins-Foster Honolulu Corp. v. Commissioner*, 417 F.2d 285 (10th Cir. 1969), cert. denied 397 U.S. 987 (1970), we rejected the same argument made herein and stated that—

Unless there is consolidated net income prior to the use of any net operating loss carryover, there is no income of the consolidated group against which to apply a carryover and therefore no reason for application of a carryover. * * * [25 TCM 1390, at 1413, 35 P-H Memo T.C. par. 66,273, at 66–1581.]

See also *Phinney v. Houston Oil Field Material Co.*, 252 F.2d 357 (5th Cir. 1958); *Likins-Foster Honolulu Corp. v. Commissioner, supra.*

For the reasons set forth above, Rosedale cannot carry forward its 1975 net operating loss of $91,801 to reduce its 1977 separate taxable income computation.

*Imputed Interest Income Adjustment Under Section 482*

In his statutory notice of deficiency for 1977 and 1978, respondent determined that the funds transferred by Tobin Construction to O'Rourke constituted loans, not corporate distributions. Since Tobin Construction had not charged O'Rourke interest on the loans, under the authority of section 482, respondent imputed interest income in the amount of $69,303 for 1977 and $53,697 for 1978 to Tobin Construction with respect to the funds that respondent determined had been loaned to O'Rourke. Imputed interest expenses in the same amounts were allowed to O'Rourke for 1977 and 1978, as correlative adjustments required under section 1.482–1(d)(2), Income Tax Regs.

The imputed interest income was computed on the average balances throughout 1977 and 1978 of the funds transferred from Tobin Construction to O'Rourke. The interest rate used was 7 percent. Respondent's imputed interest income adjustments resulted in additional income of $990,044 and $767,101 being charged to Tobin Construction for 1977 and 1978.

Respondent relies primarily on section 1.482–2(a)(1), Income Tax Regs., which provides as follows:

Sec. 1.482–2. Determination of taxable income in specific situations.—

(a) *Loans or advances*—(1) *In general.* Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest, or charges interest at a rate which is not equal to an arm's length rate as defined in subparagraph (2) of this paragraph, the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance.

Petitioner argues that the above regulation applies only to valid indebtedness and not to payments between related entities that, for accounting purposes only, were reflected on the books of the related entities as loans, but that, in substance, were corporate distributions. Petitioner cites section 1.482–2(a)(3), Income Tax Regs., which provides as follows:

(3) *Loans or advances to which subparagraph (1) applies.* Subparagraph (1) of this paragraph applies to all forms of *bona fide* indebtedness and includes:

(i) Loans or advances of money or other consideration (whether or not evidenced by a written instrument), and

(ii) Indebtedness arising in the ordinary course of business out of sales, leases, or the rendition of services by or between members of the group, or any other similar extension of credit.

*Subparagraph (1) of this paragraph does not apply to alleged indebtedness which was in fact a contribution of capital or a distribution by a corporation with respect to its shares.* * * *

[Emphasis added.]

Petitioner and respondent each cite numerous cases in support of their respective characterizations of the funds transferred as loans or corporate distributions.

In the typical case involving the characterization of funds transferred between related entities as loans or distributions, the positions of the parties are reversed from what they are herein. Taxpayers typically seek to treat the funds as loans and respondent seeks to treat the funds as dividend distributions.[7] Herein, however, petitioner is seeking distribution treatment for the funds transferred, and respondent is seeking loan treatment therefor in order to support his adjustment for imputed interest income under section 482.

---

[7]See, for example, *Williams v. Commissioner*, 627 F.2d 1032 (10th Cir. 1980), affg. a Memorandum Opinion of this Court; *Dolese v. United States*, 605 F.2d 1146 (10th Cir. 1979), cert. denied 445 U.S. 961 (1980); *Road Materials, Inc. v. Commissioner*, 407 F.2d 1121 (4th Cir. 1969), affg. a Memorandum Opinion of this Court; *Ludwig Baumann & Co. v. Commissioner*, 312 F.2d 557 (2d Cir. 1963), affg. a Memorandum Opinion of this Court.

Section 482 adjustments made by respondent carry with them a heavy presumption of correctness and petitioner has the burden of proof as to the character of the funds transferred to O'Rourke. *Commissioner v. Transport Mfg. & Equip. Co.*, 478 F.2d 731, 734–736 (8th Cir. 1973), affg. *Riss v. Commissioner*, 56 T.C. 388 (1971), and 57 T.C. 469 (1971) (supplemental opinion); *Foster v. Commissioner*, 80 T.C. 34, 142–144 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985).

We also note that a taxpayer generally is not allowed to argue that the substance of a transaction was other than the form he chose. The substance-over-form argument is always available to respondent, but it is available to taxpayers only on a limited basis. The rationale has been stated as follows:

As a general rule, the government may indeed bind a taxpayer to the form in which he has factually cast a transaction. The rule exists because to permit a taxpayer at will to challenge his own forms in favor of what he subsequently asserts to be true "substance" would encourage post-transactional tax-planning and unwarranted litigation on the part of many taxpayers and raise a monumental administrative burden and substantial problems of proof on the part of the government. [Citations omitted.]

*In re Steen v. United States*, 509 F.2d 1398, 1402–1403 n. 4 (9th Cir. 1975). That rule, however, is not absolute,[8] and section 1.482–2(a)(3), Income Tax Regs., previously cited herein, states that interest income adjustments under section 482 are not to be made by respondent where the underlying transaction was not a bona fide loan. The regulation places no express restriction on a taxpayer's (as distinguished from respondent's) ability to challenge the bona fide nature of the loan and nothing in the regulation suggests that only respondent can make that argument. Furthermore, in this case, respondent does not argue that petitioner, as a matter of law, is held to the form of the transaction.

We also note that although certain aspects (namely, the accounting entries) of the transfers in question took the form of loans, other aspects of the transfers do not support a finding that the form of the transfers was that of a loan. In other

---

[8]See, e.g., *Hoffman Motors Corp. v. United States*, 473 F.2d 254, 257 (2d Cir. 1973); *Swan v. Commissioner*, 355 F.2d 795, 797–798 (6th Cir. 1966), affg. 42 T.C. 291 (1964); *Frelbro Corp. v. Commissioner*, 315 F.2d 784, 786 (2d Cir. 1963), revg. 36 T.C. 864 (1961); *Ciaio v. Commissioner*, 47 T.C. 447, 457 (1967).

words, both the form and substance of the transfers in question are in dispute.

On the facts of this case, it is appropriate to consider all of the facts and circumstances pertinent to the transfers in order to decide whether these transfers, in substance, were loans or corporate distributions to petitioner's sole shareholder. That is a factual issue and depends primarily upon the good-faith intention of the shareholder to repay the amounts received and the intention of the corporation to require repayment. *Williams v. Commissioner*, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. a Memorandum Opinion of this Court; *Pierce v. Commissioner*, 61 T.C. 424, 430 (1974). In the case of a closely held corporation, special scrutiny is required because of the unfettered control exercised by a limited number of shareholders. *Roschuni v. Commissioner*, 29 T.C. 1193, 1201–1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959).

Mere declarations by a shareholder that he intended a transaction to constitute a loan is insufficient if the transaction fails to meet more reliable indicia of debt which indicate the "intrinsic economic nature of the transaction." *Williams v. Commissioner, supra* at 1034; *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968). In making the necessary factual determination, courts have looked to a number of objective factors including the following:

(1) the extent to which the shareholder controlled the corporation;
(2) the earnings and dividend history of the corporation;
(3) the magnitude of the payments;
(4) whether a ceiling existed to limit the amount of the corporate payments;
(5) whether or not security was given for the payments;
(6) whether there was a set maturity date;
(7) whether the corporation ever undertook to force repayment;
(8) whether the shareholder was financially able to repay the payments; and
(9) whether there was any indication the shareholder attempted to repay the amounts received.

*Dolese v. United States*, 605 F.2d 1146, 1153 (10th Cir. 1979), cert. denied 445 U.S. 961 (1980); *Alterman Foods, Inc. v. United States*, 505 F.2d 873, 877 n. 7 (5th Cir. 1974). Also relevant are the treatment of the funds on the books of the corporation, the substantiality of any repayments made by the shareholder, and the existence of corporate earnings and profits at the time

the funds were transferred. *Pierce v. Commissioner*, 61 T.C. at 430–431.

As stated, the funds in question lacked much of the form of loans and very little of the substance. No promissory notes were issued. No interest payments were due. No maturity dates were set. No security was established. What repayments occurred were in effect little more than bookkeeping entries with respect to the respective contributions of the related entities to the consolidated tax liabilities of the group. No cash repayments occurred.

The record does not indicate that any formal dividends were declared by Tobin Construction other than the dividend declarations that were necessary to enable petitioner to reverse accounting entries that had been made reflecting the balance of the intercompany receivable account. No cash dividends were paid to O'Rourke in connection with the dividends declared. The funds that had been transferred prior to the declaration of the dividends (namely, the funds in question herein) simply were treated as satisfying the obligation of Tobin Construction to pay the dividends declared. Such accounting entries appear to have been intended from the outset. In other words, the ultimate form and substance of the transfers in question from Tobin Construction to O'Rourke were dividends.

O'Rourke had no intention of repaying the funds transferred, and Tobin Construction had no intention of being repaid by O'Rourke. The footnote references in Tobin Construction's financial statements, although they mention repayment as a possibility, are more significant in their acknowledgement that the funds transferred likely were to be recharacterized as dividends even for accounting purposes, which is what occurred.

For the reasons set forth above, we conclude that the funds in question were not loans, but were corporate distributions from Tobin Construction to O'Rourke, its sole shareholder. Accordingly, we find for petitioner on this issue.

*Decision will be entered under Rule 155.*