AMIR A. TAHAMTAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Tahamtan v. Commissioner
Docket Nos. 23936-93, 24302-93, 24303-93
United States Tax Court
T.C. Memo 1995-226; 1995 Tax Ct. Memo LEXIS 230; 69 T.C.M. (CCH) 2682; May 23, 1995, Filed *230 Decisions will be entered under Rule 155. Prior to their divorce on November 9, 1987, H and W operated two corporations, P1 and P2. H was the sole shareholder of P1 and P2 until the date of the divorce settlement. P1 and H owned various parcels of rental real property. From 1983 through 1987, H or W (acting on H's behalf), withdrew funds from P1 and P2 which were recorded on the corporate books as shareholder loans. Pursuant to a separation agreement entered into by H and W contemporaneously with the divorce, H transferred to W various parcels of real property, as well as all of his stock in P1 and P2. At the time of the transfers, the books of P1 and P2 reflected outstanding loans to H in the total amount of $ 613,896.88, which reflected withdrawals by or for the benefit of H from P1 and P2 during the years 1983 to 1987, inclusive. The outstanding loans were not repaid by H. In 1989, H and W modified the 1987 separation agreement. The modified agreement provided for the transfer back to H by W and P1 of various properties, with H agreeing to assume outstanding liabilities that encumbered or were connected with the properties. On its return for its fiscal year ending June *231 30, 1989, P1 deducted a loss in the amount of $ 15,927. The loss was calculated by using the amount of the liabilities assumed by H as P1's amount realized and subtracting from that amount P1's adjusted bases in the properties. 1. Held: H received constructive dividends in 1983 through 1987 in the amounts by which the outstanding balances in shareholder loan accounts increased during those years. However, since R did not request by an appropriate pleading an increased deficiency for 1986, one of the years before the Court, an increased deficiency for that year may not be determined. Sec. 6214(a), I.R.C. The remaining portion of the purported loans were dividends in the years in which they were received, which were years not before the Court except for 1987. 2. Held, further, the 1989 property transfers from W and P1 to H were coerced by H, constituting theft by extortion under Georgia law, and did not result in a constructive dividend to W in 1989 under sec. 316, I.R.C., or income to P1 in that year under sec. 311(b)(1), I.R.C.
3. Held, further, H received gross income taxable under sec. 61(a), I.R.C., in 1989 as a result of property transfers to *232 him by W and P1 induced by extortion. 4. Held, further, P1 incurred a theft loss under sec. 165(a), I.R.C., as a result of the transfers to H induced by extortion in 1989. 5. Held, further, P1 is liable for the addition to tax under sec. 6651(a)(1) for failure to timely file its June 30, 1989, return. Amir A. Tahamtan, pro se, in docket No. 23936-93. For petitioners in docket Nos. 24302-93 and 24303-93: Robert J. Hipple and Michelle M. Kenyon. For respondent: Larry D. Anderson. NIMS
NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In this consolidated case respondent determined the following deficiencies in petitioners' Federal income taxes, additions to tax, and penalties: Petitioner Amir A. Tahamtan
Taxable
Addition to Tax
Penalty
Year
Deficiency
Sec. 6661
Sec. 6662
1986
$ 9,698
$ 2,425
$ -- 1987
207,103
51,776
-- 1989
150,272
-- 30,054 Petitioner Peggy J. Brackett
Petitioner Peggy J. Brackett
Taxable
Penalty
Year
Deficiency
Sec. 6662
1989
$ 166,399
$ 33,280
Petitioner APA Services
Fiscal Year
Additions to Tax
Ended
Deficiency
Sec. 6651(a)(1)
Sec. 6661
6-30-86
$ 5,826
$ --
$ -- 6-30-89
180,018
9,001
45,005
*233 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues for decision are: (1) Whether petitioner Amir A. Tahamtan had income in 1986 or 1987 as a result of purported loans made by either Petitioner APA Business Services, Inc., or APA Business Machines, Inc. (2) Whether the transfer of property by petitioner APA Business Services, Inc., to petitioner Amir A. Tahamtan pursuant to a modified settlement agreement executed between petitioner Amir A. Tahamtan and petitioner Peggy J. Brackett constituted either: (a) a constructive dividend to petitioner Peggy J. Brackett with a corresponding realized gain to petitioner APA Business Services, Inc. under section 311(b)(1), (b) a tax-free exchange of property between former spouses pursuant to section 1041, or (c) gross income to petitioner Amir A. Tahamtan under section 61(a), with a corresponding theft loss to petitioner APA Business Services, Inc., under section 165. (3) Whether petitioner APA Business Services, Inc., is liable for the late filing addition to tax under *234 section 6651(a)(1) for its taxable year ending June 30, 1989. As to all three petitioners, respondent concedes the additions to tax under section 6661 and penalties under section 6662 for all years before the Court. Additionally, respondent concedes that for purposes of calculating any gain realized by petitioner APA Business Services, Inc., under section 311(b)(1) some of the properties transferred were not appreciated property as defined by that section. FINDINGS OF FACT Some of the facts have been stipulated, and are so found. Petitioner Amir A. Tahamtan (Tahamtan) and petitioner Peggy J. Brackett (Brackett) both resided in Atlanta, Georgia, at the time they filed their petitions. The principal office of petitioner APA Business Services, Inc. (APA Services) was located in Atlanta, Georgia, at the time its petition was filed. Tahamtan and Brackett were married on May 25, 1963. During their marriage they had two children, a son named Amir A. Tahamtan, II, and a daughter named Mina Tahamtan. Early in the marriage, Tahamtan, while a student at Georgia Tech University, started a business which he operated out of his apartment. Eventually, Tahamtan and Brackett formed and operated *235 two corporations, APA Services and APA Business Machines, Inc. (APA Machines), which engaged in the sale and servicing of IBM business equipment. Additionally, over the years Tahamtan acquired multiple parcels of rental real property, title to some of which was in Tahamtan's name individually, while title to others was in the name of APA Services. Tahamtan also owned AA Enterprises, an unincorporated association, which also held title to some of the properties in which Tahamtan had invested. Some of the latter were purchased with funds borrowed from either APA Services or APA Machines. Just prior to the relevant events herein, Tahamtan began making substantial investments in certain Florida condominiums. To this end, Tahamtan spent a considerable amount of time in Florida while Brackett remained in Atlanta, ran the corporations, and took care of family affairs. Eventually, Tahamtan acquired multiple condominiums in Florida which, due to unforeseen events in the Florida real estate market, turned out to be poor investments. At various relevant times either Tahamtan or Brackett withdrew funds from the corporations in order to meet the family's living expenses. Judy Wood (Wood), *236 a C.P.A., kept the books and prepared income tax returns for Tahamtan and Brackett, as well as for the corporations operated at various times by Tahamtan and Brackett. At the end of each year, Wood maintained cumulative balances of withdrawals from the corporations which were treated as loans to Tahamtan. All of the putative loans were booked to Tahamtan's account because he was the sole shareholder of each corporation; however, some of the withdrawals represented funds that Brackett withdrew in order to meet the family's expenses. The following table summarizes the cumulative balances of loans booked to Tahamtan's account as of the end of APA Services's fiscal years from June 30, 1983 to June 30, 1987, inclusive: Fiscal Year
Total Loans on
Increase
Ended
Corporate Books *
of Loan Balance
6-30-83
$ 216,380
$ 216,380
6-30-84
296,641
80,261
6-30-85
320,268
23,627
6-30-86
386,268
66,000
6-30-87
549,497
163,229
* The amounts in this column are the yearend
balances that remained after Wood reclassified
some of the loans as bonuses paid to Tahamtan
or Brackett which are discussed infra.
As of December 30, 1986, the total amount of loans booked *237 to Tahamtan's account was $ 590,645.83. As of November 10, 1987, the date Tahamtan and Brackett were divorced, the total amount of loans booked to Tahamtan's account was $ 613,896.88. Thus, from January 1, 1987 until November 10, 1987, the date on which Tahamtan ceased being a shareholder of APA Services and APA Machines pursuant to a separation agreement between Tahamtan and Brackett, the amount advanced as loans to Tahamtan increased by $ 23,251.05. In order to prepare certain income tax returns, Wood met each year with Tahamtan and Brackett to discuss various matters. At some point Wood became concerned that the outstanding loans to Tahamtan might be recharacterized by the Internal Revenue Service (IRS) as disguised dividends. Therefore, in each year Wood reclassified a portion of the outstanding loan balances as bonuses paid to either Tahamtan or Brackett, and reduced the outstanding balances by the amount reclassified as bonuses. The following table summarizes the amount of loans reclassified as bonuses paid to Tahamtan and Brackett, as indicated: Taxable Year*
Bonuses to Tahamtan
Bonuses to Brackett
1981
$ 79,922
$ 0
1982
0
0
1983
50,100
0
1984
75,000
0
1985
155,000
0
1986
135,000
0
1987
100,000
50,000
* "Taxable Year" reflected in this table is as
stipulated by the parties, and presumably
refers to fiscal years ended June 30 in each
of the years listed.
*238 On November 9, 1987, Tahamtan and Brackett executed a separation agreement in connection with the dissolution of their marriage (the Separation Agreement). Pursuant to the Separation Agreement, Tahamtan transferred to Brackett all of his property within the State of Georgia, which included several parcels of rental real property held in Tahamtan's name, as well as all of the stock of both APA Services and APA Machines. Tahamtan retained the Florida condominiums. The Separation Agreement also provided that Tahamtan would receive custody of the couple's son, Amir, while Brackett would receive custody of their daughter, Mina. On November, 10, 1987, the DeKalb County Superior Court (Superior Court) entered a decree of final divorce between Tahamtan and Brackett which incorporated into the decree the terms of the Separation Agreement. Starting in 1979 or 1980, Robert Krell (Krell), a lawyer, handled a number of real estate closings for Tahamtan. Despite some reservations by Krell, he agreed to represent Brackett in 1987 in connection with the divorce proceedings after Tahamtan and Brackett had urged him to do so. After the divorce in 1987, Tahamtan and Brackett continued to experience *239 economic and family problems. The children had developed disciplinary problems which seemed to worsen after the divorce. Notwithstanding the terms of the Separation Agreement, Tahamtan did not transfer all of the Georgia property to Brackett. On April 4, 1988, she wrote Krell as follows: This letter is to confirm our conversation regarding my request not to file Quick [sic] Claim Deeds to my name on the following properties. 1. 382 Acres undeveloped land Oconee County (Allen Motor Company) 2. 40 Acres on Atlanta Highway Clarke County (Ms. Ruth Booth) 3. 11 Mountain View Estates (Ahmad's Residence) 4. 5 NEW HOUSES, CUMMING GEORGIA (Driftwood Mobile Home Park) Lots 46, 5, 5A, 3 & 3A. I would appreciate your cooperation in this regard. Mr. Tahamtan has expressed the desire to keep these properties and I cannot meet the financial obligations in retaining these properties.
At the time Brackett wrote the above letter, Tahamtan had telephoned Brackett, threatening to bring over a gun to kill her "if I didn't do this." This threat continued the pattern of harassment that had commenced in 1987 shortly after the divorce settlement. With the exception of the properties *240 referred to in the above letter, Tahamtan had previously quitclaimed all of the Georgia real property held in his name to Brackett, and transferred his stock in both corporations to Brackett, pursuant to the Separation Agreement. Some of the properties that were transferred to Brackett were run down and were losing money. In January, 1989, Tahamtan called Brackett to say that he wanted to come to Brackett's business office in Chamblee, Georgia, to pick up some personal items, including his father's Bible. Brackett didn't want Tahamtan there without Krell being present. After rummaging through some boxes, Tahamtan was unable to find the items he sought, and flew into a rage. Among other things, he spit in Brackett's face and kicked a hole in the wall. Brackett called the police to come and quell the disturbance, and Tahamtan was arrested. Late one night, probably on January 21, 1989, Brackett again summoned Krell to the Chamblee office. When Krell arrived, Brackett and Tahamtan were arguing back and forth about the Georgia property. Tahamtan wanted all of the property deeded back to him and Brackett was fearful of the consequences of not complying. Krell advised Brackett *241 that there was no legal requirement that she do so, but Brackett told Krell "you just don't know what will happen to me [if I don't]." Brackett commenced typing quitclaim deeds on forms which had been brought by Krell to convey various parcels of real estate back to Tahamtan. Krell believed that the transfers were made under duress. Tahamtan physically confronted Brackett notwithstanding a previous court order to stay away. At some time between January 21, 1989, and January 25, 1989, Brackett also typed up a Security Deposit Agreement, which she and Tahamtan signed on January 25, 1989. The Security Deposit Agreement provides as follows: AGREEMENT I ASSIGN MY INTEREST TO THE PROPERTY KNOWN AS 5089 GALBRAITH CIRCLE, Stone Mountain, Georgia and all monies due from Mr. John K. Henkel, to Amir Ahmad Tahamtan. I further agree that from $ 38,000.00 which is due from Dr. M. Joel Hill for property located at 1765 Clairmont Road, Decatur, Georgia, I will pay the sum of $ 12,670.00 as soon as the funds from Dr. Hill have been credited to my account. The remaining balance of $ 25,330.00 shall be paid to Amir Ahmad Tahamtan on or before May 15, 1989. In consideration of these payments *242 and transfer of my interest in 5089 Galbraith Circle, Stone Mountain, Georgia, Amir Ahmad Tahamtan acknowledges that he shall take full responsibility for all security deposits on those properties that have been transferred to him in Exhibits A & B attached hereto.
Amir Ahmad Tahamtan shall hold Harmless APA BUSINESS SERVICES, INC. & APA BUSINESS MACHINES, INC. AND PEGGY JEAN TAHAMTAN their heirs, successors and assigns for Security Deposits on the properties listed in Exhibits A & B. 1/25/89 PEGGY JEAN TAHAMTAN DATE 1/25/89 AMIR AHMAD TAHAMTAN DATE 1/25/89 Robert G. Krell 1/25/89 NOTARY PUBLIC DATE My commission expires October 25, 1991
After the January 21, 1989, confrontation between Brackett and Tahamtan, Krell prepared an agreement (the Settlement Agreement) which embodied Brackett's agreement obtained by Tahamtan to transfer back to Tahamtan on behalf of Brackett and APA Services the properties received by her directly or indirectly through the corporation, except for two parcels. APA Services transferred in all 15 parcels back to Tahamtan. An additional property, the Cortez Way Property, was listed as a property to be transferred, but was *243 not transferred in 1989. The Settlement Agreement was signed on January 30, 1989, but embodied the comprehensive agreement arrived at previously. Under the Settlement Agreement, Tahamtan was to assume any outstanding liabilities, including accrued property taxes, encumbering the properties. Pursuant to the Settlement Agreement, Brackett also relinquished custody of Mina, but retained the right to claim Mina "as a tax deduction." The Settlement Agreement was submitted to the DeKalb County Superior Court and by Order dated February 3, 1989, was incorporated by reference into the Separation Agreement dated November 10, 1987. There is an inadvertent reference in the Court's Order to "January 25, 1989," but the context and the language of the Settlement Agreement make it clear that the Settlement Agreement was intended to be the subject of the Order. Pursuant to the Superior Court's Order, Brackett, on behalf of herself and APA Services, quitclaimed to Tahamtan the properties provided for in the Settlement Agreement, with one exception. The transfer of one of the properties known as 2353 Cortez Way (the Cortez Way Property), owned by APA Services, could not be effected because the *244 legal description of the property in the quitclaim deed was defective. Tahamtan requested Brackett and Krell to cure the defect, which they failed to do. On August 10, 1990, Tahamtan filed a complaint in Superior Court against Brackett and APA Services, alleging that the defendants had failed to transfer the Cortez Way Property as required by the February 3, 1989 Court Order. In his complaint, Tahamtan further alleged that Brackett had failed to return to him certain tenants' rental security deposits, as was required by the Security Deposit Agreement dated January 25, 1989. Brackett and APA Services filed answers and counterclaims to the Complaint. The counterclaims alleged in part that Brackett and APA Services never gave their free assent to the agreement on which Tahamtan sued, and that, since the time of the divorce, Tahamtan had caused Brackett "individually and as President of APA Business Services, much mental and emotional aggravation and harm, for which she is entitled to be compensated." The counterclaim asserted in part that Tahamtan had wrongfully assaulted her in January, 1989, by violently hitting and abusing her and causing her personal injury, without cause or *245 provocation on her part; that Tahamtan had falsely imprisoned her in her own home and destroyed her personal property; and that, on other occasions, Tahamtan had entered her place of business and her home, and had caused damage to her property or person. On March 21, 1991, Brackett and APA Services filed second and third amendments to the counterclaim, seeking recovery from Tahamtan of property removed by him from Brackett's personal residence. On June 24, 1991, following a jury trial on the complaint and counterclaims, the jury found as follows: JURY VERDICT
I. As to the Plaintiff's claims: ( ) We, the Jury, find for the Plaintiff Amir A. Tahamtan against Defendant Peggy Jean Brackett Tahamtan in the amount of $    . (X) We, the Jury, find for the Defendant Peggy Jean Brackett Tahamtan. II. As to the Defendant's counterclaims: (X) We, the Jury, find for Peggy Jean Brackett Tahamtan against Amir A. Tahamtan in the amount of $ 250,000.00 plus $ 30,000.00 costs of litigation. ( ) We, the Jury, find for Amir A. Tahamtan. We, the Jury find that Peggy Jean Brackett Tahamtan * * * is not entitled to punitive damages.
Thereafter, Tahamtan appealed *246 the decision of the Superior Court. The Court of Appeals affirmed the jury's verdict in all respects. Tahamtan v. Tahamtan, 420 S.E.2d 363 (Ga. App. 1992). At some point after the events described above, Brackett ceased being represented by Krell. Brackett and APA Services were represented in the Superior Court trial and the appeal of that case by George S. Stern. Wood prepared APA Services's June 30, 1989, return in November, 1989, and gave the return to Brackett with instructions to file it by March 15, 1990. Originally, APA Services's fiscal year return was due on September 15, 1989; however, Wood secured on APA Services's behalf an extension of time to March 15, 1990, within which to file. Just prior to March 15, 1990, Wood reminded Brackett to file the return. APA Services's 1989 return was stamped "Received" by the IRS on April 5, 1990. APA Services submitted with its 1989 return a check dated March 15, 1990. Brackett was under the impression that it was APA Services's normal course of business to mail checks on the same day that they were signed. On its income tax return filed for its June 30, 1989, fiscal year, APA Services deducted *247 a loss in the amount of $ 15,927 arising from Brackett's transfer to Tahamtan, on behalf of APA Services, the real properties held in APA Service's name. Wood, the return preparer, calculated the loss by using the total amount of the liabilities assumed by Tahamtan as the sales price, and deducting from that figure the tax basis of the properties transferred, resulting in the $ 15,927 loss claimed. OPINION Issue 1. Outstanding Loans to Petitioner Tahamtan
On November 10, 1987, the date of the divorce, the books of APA Services and APA Machines reflected total loans to Tahamtan in the amount of $ 613,896.88. In her notice of deficiency issued to Tahamtan covering the year 1987, respondent determined that Tahamtan's gross income for that year should have included, as dividend income, $ 613,896. Respondent later amended her answer to assert that petitioner Tahamtan had additional income in the amount of $ 613,896 for 1987 regardless of whether this amount was treated as dividend income, cancellation of indebtedness income, or fell within some other definition of income. Tahamtan contends that if the above-stated amount is treated as a loan, then he repaid that loan by way *248 of relinquishing the equity he had in the properties transferred to Brackett pursuant to the Separation Agreement. Tahamtan further contends that if the amount in dispute is treated collectively as a constructive dividend, then dividends were income to him in the years in which they were received, in which case respondent is barred by the statute of limitations from determining deficiencies on them. Tahamtan has the burden of proving that the adjustments proposed by respondent's notice of deficiency issued to Tahamtan are erroneous. Rule 142(a). Whether amounts withdrawn by a shareholder from a corporation are bona fide loans or constructive dividends is a question of fact to be answered by analyzing the various facts and circumstances surrounding the withdrawals. Pierce v. Commissioner, 61T.C. 424, 430 (1974). In answering this question, we look "primarily upon the good-faith intention of the shareholder to repay the amounts received and the intention of the corporation to require repayment." J.A. Tobin Constr. Co. v. Commissioner, 85 T.C. 1005, 1022 (1985) (citing Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), *249 affg. T.C. Memo. 1978-306); Pierce v. Commissioner,supra at 430. As an aid to making this factual determination, we consider the following factors: (1) the extent to which the shareholder controlled the corporation; (2) the earnings and dividend history of the corporation; (3) the magnitude of the payments; (4) whether a ceiling existed to limit the amount of the corporate payments; (5) whether or not security was given for the payments; (6) whether there was a set maturity date; (7) whether the corporation ever undertook to force repayment; (8) whether the shareholder was financially able to repay the payments; and (9) whether there was any indication the shareholder attempted to repay the amounts received. [J.A. Tobin ConstructionCo., supra at 1022; citations omitted.]
Tahamtan was the sole shareholder of both corporations during the time in which funds were withdrawn and booked to his account, so it would be difficult for him to deny as a matter of law that he controlled the two corporations. The record is filled with examples of occasions when Tahamtan caused funds to be withdrawn from the corporations, *250 and used either to purchase properties or to satisfy the needs of his family. Throughout the trial, Tahamtan attempted to show that Brackett removed funds from the corporations for her own purposes without Tahamtan's knowledge or consent. However, the record establishes that funds withdrawn by Brackett were used to satisfy the family obligations of Tahamtan and Brackett; thus, we conclude that Tahamtan benefited from the use of the funds withdrawn by Brackett. This factor supports the conclusion that the purported loans were in fact disguised dividends. As to the magnitude of the payments, each year the balances in the corporations' loans to shareholder account increased by various amounts, ranging from a low of $ 23,627 to a high of $ 216,380. Furthermore, these amounts would have been larger had it not been for Wood's reclassification of some of them as bonuses paid to either Tahamtan or Brackett. Thus, it is apparent that the payments were substantial, and this factor supports the conclusion that they were disguised dividends. As to the remaining factors, the record does not contain any evidence which would suggest that the amounts withdrawn and booked to Tahamtan's account *251 were intended as loans. There is no evidence that the purported loans had a fixed maturity date or that Tahamtan ever attempted to repay them, except for the annual reclassifications of a portion of the withdrawals as bonuses which is, of course, evidence that he did not intend to pay that portion, at least. Furthermore, there is no evidence that the corporations ever attempted to enforce repayment or that Tahamtan was financially able to make repayment. The absence of any evidence in the record pertaining to these remaining factors weighs strongly in favor of treating the purported loans as disguised dividends. Aside from the treatment of the withdrawals as stockholder loans on the corporate books, there is nothing in the record to indicate that Tahamtan ever had the slightest intention of repaying the amounts advanced to him. Lastly, we again note that Wood, who served as C.P.A. for Tahamtan, Brackett, and the corporations, acknowledged that she believed that respondent might consider the purported loans to be disguised dividends. With this potential treatment in mind, Wood reclassified a portion of the purported loans each year as bonuses paid to either Tahamtan or Brackett. *252 The manner in which Wood treated the purported loans is consistent with treating the loans as disguised dividends as opposed to bona fide shareholder loans. In sum, the entire record supports the conclusion that the funds withdrawn from the corporations and booked to Tahamtan's account were in fact dividends. Therefore, we hold that the entire amount of funds that were withdrawn from the corporations and booked to Tahamtan's account, excluding the amounts reclassified as bonuses and upon which taxes have already (presumably) been paid, constituted dividend income to Tahamtan in the years in which the funds were withdrawn. Respondent asserts that the amount of loans on the corporations' books as of the date of the divorce represents either cancellation of indebtedness income or dividend income to Tahamtan. Since the evidence is overwhelming that Tahamtan never had any intention of repaying the withdrawals, there were no loans and consequently no cancellation of indebtedness income. Our jurisdiction to redetermine deficiencies determined by respondent is limited to the taxable years addressed by the notice of deficiency. Sec. 6214(b). Further, we have jurisdiction to *253 redetermine a greater deficiency than that which is determined in the notice of deficiency for any year before the Court provided that respondent asserts a claim for such an increased deficiency. Sec. 6214(a). However, we may not determine a greater deficiency where respondent has not formally pleaded an increased deficiency. Moise v. Burnet,52 F.2d 1071, 1073 (9th Cir. 1931), revg. 13 B.T.A. 525 (1928); Estate of Petschek v. Commissioner, 81 T.C. 260, 271-272 (1983), affd. 738 F.2d 67 (2d Cir. 1984); Koufman v. Commissioner, 69 T.C. 473, 475-476 (1977). Respondent issued two separate notices of deficiency to Tahamtan, one covering Tahamtan's 1986 taxable year and the other covering his 1987 and 1989 taxable years. In the notice of deficiency for 1986, respondent determined a deficiency in the amount of $ 9,698 as the result of a disallowed net operating loss in the amount of $ 25,675 that Tahamtan had carried back to 1986. In the notice of deficiency for 1987 and 1989, respondent determined that Tahamtan had additional dividend income in 1987 in the amount *254 of $ 613,896 as a result of the shareholder loans. At trial, respondent moved for and was granted permission to amend her answer to "encompass a broader definition of income and avoid confinement to proving dividend income." Respondent's motion and amended answer refer only to the years 1987 and 1989, and make no mention of 1986. Furthermore, at no point did respondent, either in her motion or otherwise, claim that the amount of the deficiencies determined for 1986, 1987, or 1989 should be increased. Tahamtan is a calendar year taxpayer, whereas APA Services and APA Machines use a fiscal year ending on June 30. The record contains outstanding shareholder loan balances as of June 30, 1985, June 30, 1986, December 30, 1986, and November 10, 1987. The record also indicates that Tahamtan and Brackett withdrew funds from the corporations on a regular and continuous basis. Accordingly, we hold that in 1986, Tahamtan received as constructive dividends $ 237,378. We derived this amount by including one-half of the $ 66,000 increase in outstanding loans from June 30, 1985, to June 30, 1986, or $ 33,000, and then adding the $ 204,378 increase in outstanding loans from June 30, 1986, *255 to December 30, 1986. However, because respondent never pleaded, formally or informally, an increased deficiency for 1986, respondent is not entitled to receive an increased deficiency from Tahamtan for that year. As to the period from January 1, 1987, to November 10, 1987, on which latter date Tahamtan ceased being a shareholder of either corporation, we hold that the increased amount of loans booked to Tahamtan's account in the amount of $ 23,251 constituted constructive dividends. The remaining portion of the $ 613,896.88 in purported loans to Tahamtan were constructive dividends received by him in years prior to 1987, and are therefore not taxable to Tahamtan in that year. Issue 2. Property Transfers from APA Services to Tahamtan
Pursuant to the Settlement Agreement, Brackett caused APA Services to transfer 15 parcels of real property to Tahamtan. (An additional parcel referred to in the Settlement Agreement, the Cortez Way Property, was not transferred in 1989.) Certain other properties held by Brackett in her own name were also transferred to Tahamtan pursuant to the Settlement Agreement, but the tax treatment of the personally held properties is not an issue in *256 this consolidated case. In the deficiency notice sent to Tahamtan that included the year 1989, respondent determined an income tax deficiency for that year in the amount of $ 150,272, based in part upon the abovementioned transfers by APA Services. Respondent placed a gross value on these properties of $ 1,065,830, which was then reduced by the amount of mortgages assumed by Tahamtan, resulting in a net value of the transfers, as computed by respondent, of $ 561,923. In the deficiency notice, respondent determined that this amount was includable in Tahamtan's gross income for 1989 under section 61(a). Respondent takes the position that the combined transfers were taxable to Brackett as a constructive dividend under section 316(a) in the first instance, and also to APA Services to the extent of gain realized on the transfers under section 311(b)(1). In the alternative, respondent's position is that, if the Court finds the transfers to have been effected due to coercion, then APA Services incurred a theft loss. Respondent strenously argues, however, that there was no coercion. Brackett and APA Services argue that (1) The transfer to Tahamtan was not a constructive dividend to *257 Brackett because Brackett received no direct or indirect economic benefit from any imputed transfer to her; (2) the transfer was not taxable to Brackett by virtue of section 1041, relating to transfers incident to divorce; (3) APA Services did not realize a section 311(b)(1) gain because the property in question was not transferred directly or indirectly to a shareholder; and (4) the transfer to Tahamtan by APA Services was the result of threats and intimidation by Tahamtan that would result in income to Tahamtan but not to Brackett or APA Services. Since we find ample evidence of coercive transfers on the record before us, we need not address questions relating to dividend equivalency, transfers incident to divorce, or corporate gain realized on distributions to or for the benefit of a shareholder. We have made extensive findings of fact spelling out the continuing pattern of abusive conduct engaged in by Tahamtan commencing from at least the divorce in November, 1987, and no purpose would be served by repeating these findings at this point. While the testimony of an interested party must always, almost by definition, involve a certain amount of self-interest, we found the truthfulness *258 of Brackett's testimony regarding harassment to be essentially confirmed by documents in the record, admissions by Tahamtan himself, and the testimony of Krell, an economically disinterested witness in this consolidated case, who was an eyewitness to some of Tahamtan's abuse of Brackett and her reaction to it, both where Tahamtan was present and at other times as well. Nevertheless, some further comment is appropriate. The bottom line of respondent's position on this issue is that Tahamtan received real estate valued by respondent at $ 561,923 on which Brackett and APA Services are taxable in the total amount of $ 346,417. Respondent does not discuss the tax consequences to Tahamtan in either her Opening Brief or Reply Brief, aiming the entire discussion of this issue at Brackett and APA Services. We find this surprising in that in the 1989 deficiency notice respondent determined an income tax deficiency against Tahamtan in the amount of $ 150,272 based on the transfers. The January 30, 1989, Settlement Agreement, which was confirmed by the Order of the DeKalb County Superior Court on February 3, 1989, called for the transfer back to Tahamtan of all but two of the 46 separate *259 parcels Brackett received, personally or indirectly as owner of APA Services, pursuant to the 1987 Separation Agreement. When APA Services failed to transfer one of the properties, the Cortez Way Property, back to Tahamtan, he brought suit for specific performance in the Superior Court. Brackett and APA Services counterclaimed, alleging that Brackett's agreement was obtained by duress, and demanding damages for bodily pain and mutual suffering caused by Tahamtan's continued physical and mental abuse. While there is some confusion as to the date of the agreement which was the actual subject of the State Court litigation, there can be no doubt that the litigation related to the provisions of the January 30, 1989, Settlement Agreement, which, apparently, was intended to memorialize a verbal understanding arrived at a few days previously. Tahamtan testified that the actual agreement took place on January 25, 1989, and was implemented on January 30, 1989. The Settlement Agreement itself, in paragraph 5, speaks as of January 25, 1989. While there is also an agreement -- the Security Deposit Agreement -- which was signed on January 25, 1989, it is obvious by its terms that it could *260 not have embodied the entire arrangement undertaken by Tahamtan, Brackett, and APA Services on that date for the conveyance back to Tahamtan of almost all of the property he had relinquished in the 1987 divorce settlement. Furthermore, it was the Settlement Agreement, not the Security Deposit Agreement, that involved the Cortez Way Property, which Tahamtan sought to have transferred back to him by APA Services. The Complaint and Counterclaims were tried before a jury, which in due course denied relief to Tahamtan, and awarded Brackett damages on her counterclaims in the amount of $ 250,000, plus attorneys' fees (APA Services having received a directed verdict in its favor at an earlier stage of the litigation). The Georgia Court of Appeals affirmed the jury verdict in all respects, describing the litigation in the following language: In 1987, appellant [Tahamtan] and his wife [Brackett] (hereinafter "appellee") entered into a settlement agreement pursuant to their divorce to resolve all issues of property division and child custody. Following the divorce, and continuing for several years thereafter, appellant engaged in a course of harassing and threatening conduct toward appellee *261 and her business, which included physically abusing appellee and destroying items in her home with a sledge hammer. As a result of appellant's continuing behavior, appellee entered into an agreement to transfer certain property owned by her and her corporation to appellant. Appellant brought a pro se action against appellee and her corporation for breach of that agreement. Appellee counterclaimed for damages, alleging physical and mental abuse, false imprisonment and the theft of several valuable rugs from her home by appellant. Appellant represented himself at trial, which resulted in a directed verdict in favor of the corporation, and a jury verdict in favor of appellee on the main claim and the counterclaim. The jury awarded appellee $ 250,000 in damages plus $ 30,000 in costs of litigation. [Tahamtan v. Tahamtan, 420 S.E. 2d 363, 363-364 (Ga. App. 1992).]
The January 30, 1989, Settlement Agreement itself reflects no significant benefits flowing to Brackett, and certainly none which would support the inference of an indirect benefit to her in the neighborhood of $ 561,923, the amount asserted by respondent. The Settlement Agreement *262 provides that Tahamtan will assume, as of January 25, 1989, liability for all mortgages, taxes, insurance and other expenses relating to the properties. But since all of these items are either liens on the properties or items necessary to maintain them, their assumption by Tahamtan, the about-to-be new owner, was of no benefit to Brackett, and obviously had to be undertaken by Tahamtan in order to enjoy the benefits of the properties. The Agreement also gives Brackett the right to "claim * * * Mina * * * as a deduction," very much a de minimis benefit in light of what Brackett and APA Services were forced to give up in exchange. Thus the Settlement Agreement on its face forms the basis for a clear inference that Brackett must have entered into it for reasons other than some economic benefit to herself or to APA Services. In light of the record before us, the transfers could only have been the result of coercion, threats, and harassment by Tahamtan. APA Services argues, among other things, that the coerced transfers caused it to incur a theft loss, citing respondent's own revenue ruling, Rev. Rul. 72-112, 1972-1 C.B. 60, and Title 16, section *263 16-8-16, of the Official Code of Georgia. Section 165(a) allows "as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(e) provides that "For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." In this consolidated case there is no dispute that APA Services transferred the parcels of real estate to Tahamtan in 1989, and the only question to be decided is whether there occurred a "theft" within the contemplation of section 165. We generally agree with the statement in Rev. Rul 72-112, that Considering the broad general meaning of theft, it must be presumed that Congress used the term "theft" so as to cover any theft, or felonious taking of money or property by which a taxpayer sustains a loss, whether defined and punishable under the penal codes of the states as larceny, robbery, burglary, embezzlement, extortion, kidnapping for ransom, threats, or blackmail. [ Rev. Rul. 72-112, 1972-1 C.B. 60, 61.]
We also note that section *264 16-8-16 of Title 16 of the Official Code of Georgia provides in relevant part: 16-8-16. Theft by extortion. (a) A person commits the offense of theft by extortion when he unlawfully obtains property of or from another person by threatening to: (1) Inflict bodily injury on anyone or commit any other criminal offense; * * * (3) Disseminate any information tending to subject any person to hatred, contempt, or ridicule or to impair his credit or business repute; [Ga. Code Sec. 18-8-16(a) (Michie 1992).]
One of the requisites for claiming a theft loss under section 165 is that the activity in question must have constituted a crime under the law of the State where the loss was sustained. Paine v. Commissioner, 63 T.C. 736 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). The absence of a criminal prosecution is not determinative. Skolnik v. Commissioner, 55 T.C. 1055, 1062 (1971). But there must be a showing, of course, that the loss was "occasioned by circumstances clearly indicating theft." Monteleone v. Commissioner, 34 T.C. 688, 694 (1960); *265 see Martin v. Commissioner,T.C. Memo. 1988-369; Jernigan v. Commissioner,T.C. Memo. 1981-44. In this situation, Tahamtan threatened to inflict bodily harm on Brackett, the 100-percent stockholder of APA Services, and to destroy her property and business if she did not comply with his demands. We believe Tahamtan's course of conduct meets the definition of "theft by extortion" found in section 16-8-16(a)(1) of the Official Code of Georgia, in that Tahamtan obtained the property in question by repeatedly threatening Brackett with bodily harm if she did not comply with his demands. He was, in fact, arrested by the police for the acts he committed in the confrontation witnessed by Krell in Brackett's office referred to in our Findings of Fact. Tahamtan also violated Title 16, section 16-8-16(a)(3), of the Official Code of Georgia by making phone calls and entering Brackett's place of business for the purpose of threatening her and her employees. Brackett and Krell both testified to these acts, and were not contradicted by Tahamtan. Since APA Services was wholly owned by Brackett at the time of the transfers and Brackett *266 as the agent of APA Services was forced by Tahamtan to cause APA Services to make the transfers, we conclude that the transfers were extorted, and that APA Services as a consequence incurred a theft loss deductible under section 165(a). Section 1.165-8, Income Tax Regs., provides in relevant part: (c) Amount deductible. The amount deductible under this section in respect of a theft loss shall be determined consistently with the manner prescribed in section 1.165-7 for determining the amount of casualty loss allowable as a deduction under section 165(a). In applying the provisions of paragraph (b) of section 1.165-7 for this purpose, the fair market value of the property immediately after the theft shall be considered to be zero. * * *
Section 1.165-7, Income Tax Regs., provides in relevant part: (b) Amount deductible. (1) General rule. In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for purposes of section 165(a) shall be the lesser of either -- (i) The amount which is equal to the fair market value of the property immediately before the casualty *267 reduced by the fair market value of the property immediately after the casualty; or (ii) The amount of the adjusted basis prescribed in section 1.1011-1 for determining the loss from the sale or other disposition of the property involved.
However, if the property used in a trade or business or held for the production of income is totally destroyed by casualty, and if the fair market value of such property immediately before the casualty is less than the adjusted basis of such property, the amount of the adjusted basis of such property shall be treated as the amount of the loss for purposes of section 165(a). Thus, under these regulatory provisions, the fair market value of the property after the theft is considered to be zero ( section 1.165-8(c), Income Tax Regs., and the amount deductible is the amount of the adjusted basis prescribed in section 1.1011-1, Income Tax Regs., for determining the loss from the sale or other disposition of the property involved ( section 1.165-7(b)), Income Tax Regs.) In reporting the transfers to Tahamtan on its June 30, 1989 return, APA Services treated the net amount of various mortgages on the properties as the "sales price" realized on *268 the transfers on the theory that cancellation of indebtedness income was the only benefit received. This, when netted against the bases of the properties, produced a loss of $ 15,927, which APA Services deducted. Wood (who prepared the return) concluded, after consulting legal counsel, that the approach taken would be a conservative approach. In the APA Services deficiency notice, respondent included the excess of the combined fair market value of the properties, as determined by respondent, over their combined adjusted basis, as gain realized under section 311(b)(1). Since we have held that APA Services suffered a theft loss, APA Services is entitled to recompute its loss under the regulations above-cited. However, since APA Services has conceded, properly we believe, that it must take into account as income the amount of mortgage indebtedness on the transferred properties assumed by Tahamtan, APA Services must, in effect, reduce the amount of theft loss deducted by the amount of debt cancellation taken into income. Since the Cortez Way Property was not transferred to Tahamtan in 1989, this fact must also be taken into account in the computation of Tahamtan's section 61(a) *269 income, APA Service's loss under section 165, and its cancellation of indebtedness income. Issue 3. Addition to Tax For Late Filing
The last issue for decision is whether petitioner APA Services is liable for the addition to tax under section 6651(a)(1) for failure to timely file its June 30, 1989 return. Section 6651(a)(1) imposes an addition to tax equal to five percent of the amount of tax required to be shown on the return for each month or fraction thereof that the return is delinquent unless the taxpayer can show that there was good cause for the delay and that the delay was not the result of willful neglect. Petitioner APA Services bears the burden of proving that the addition to tax under section 6651(a)(1) does not apply. Rule 142(a). APA Services' return for its fiscal year ending June 30, 1989, was due on September 15, 1989. Wood, on behalf of APA Services, obtained an extension of time within which to file until March 15, 1990. The June 30, 1989 return was stamped "Received" by the IRS on April 5, 1990. The record does not contain the envelope within which APA Services mailed its return. Section 7502(a) provides generally that if a tax return is delivered *270 by the U.S. Mail after the due date, the date of the U.S. postmark stamped on the cover in which the return is mailed shall be deemed to be the delivery date. Brackett stopped short of testifying that she mailed the return on or before the due date, and her testimony that it was a routine practice of APA Services to mail out checks, such as a tax payment check, on the same day they were written, is insufficient to carry APA Service's burden of proof under section 6651(a)(1). Accordingly, we hold for respondent on this issue. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Peggy J. Brackett, docket No. 24302-93 and APA Business Services, Inc., docket No. 24303-93.↩