T.C. Memo. 1996-542

UNITED STATES TAX COURT

FRANCINE ACQUAVIVA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14981-94.                    Filed December 17, 1996.

<u>Richard J. Sapinski</u>, for petitioner.

<u>Julia Ann Roy</u>, <u>Frank A. Racaniello</u>, and <u>William S. Garofalo</u>,

for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in, and

additions to, the Federal income taxes of petitioner and her

husband (Mr. Acquaviva) as follows:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1)[1] | Sec. 6653(a)(2) | Sec. 6661 |
| 1985 | $38,708 | -0- | $1,935 | [2] | $9,677 |
| 1986 | 776,716 | -0- | 38,836 | [2] | 194,250 |

| 1987 | 7,826 | $391 | 391 | [2] | 9,135 |

[1] Respondent determined the additions to tax for negligence or intentional disregard of rules or regulations for 1986 and 1987 under sec. 6653(a)(1)(A).

[2] 50 percent of the interest due on the portion of the deficiency attributable to negligence as provided by sec. 6653(a)(2) for 1985 and sec. 6653(a)(1)(B) for 1986 and 1987.

Mr. Acquaviva did not join in the petition filed by petitioner and thus is not a party in this case. After concessions,[1] we must decide: (1) Whether petitioner tacitly consented to the filing of joint Federal income tax returns for each of the 3 years in issue; (2) whether payments made by Magnum Development Corp. (Magnum), Mr. Acquaviva's real estate development corporation, during the 1986 and 1987 taxable years were constructive dividends; (3) whether petitioner is relieved from joint Federal income tax liability as an "innocent spouse" by operation of section 6013(e);[2] (4) whether petitioner is liable for an addition to tax under section 6651(a)(1) for the taxable year 1987; (5) whether petitioner is liable for the additions to tax for negligence under section 6653(a)(1) and (2) for 1985 and section 6653(a)(1)(A) and (B) for 1986 and 1987; and

---

[1] Petitioner conceded before trial that the gain attributable to a 1986 condemnation award which her husband received was not properly deferred under sec. 1033. On brief, petitioner conceded that the proceeds from a 1985 involuntary conversion were also not properly deferred under sec. 1033. Petitioner concedes that these amounts are properly taxable to Mr. Acquaviva.

[2] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(6) whether petitioner is liable for the additions to tax for substantial understatement of tax under section 6661 for 1985, 1986, and 1987.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner resided in Holmdel, New Jersey.

A. Background

Petitioner and her husband have known each other for most of their lives; they grew up across the street from one another in a lower middle class neighborhood in Hoboken, New Jersey. Petitioner married Mr. Acquaviva in 1960 at the age of 17. Mr. Acquaviva was the breadwinner; petitioner was a housewife who stayed at home to take care of their four sons. Mr. Acquaviva was a residential real estate developer and, during the 1986 and 1987 taxable years, an officer-shareholder in Magnum. Petitioner and Mr. Acquaviva enjoyed a harmonious and close family relationship with each other and their sons.

Shortly after they were married, the Acquavivas moved into a tenement apartment in Hoboken, New Jersey. The couple's standard of living improved throughout their marriage as Mr. Acquaviva's businesses prospered. By the early 1980's, the family lived in a large five-bedroom home, which Mr. Acquaviva built, in an upscale neighborhood located in Holmdel, New Jersey. The couple had a

housekeeper, enjoyed giving gifts of expensive jewelry and furs, drove expensive automobiles, took family vacations, and maintained a summer home on the New Jersey shore. Petitioner maintained an affluent lifestyle throughout the years in issue.

Throughout their marriage, petitioner and Mr. Acquaviva have kept their household responsibilities separate. Mr. Acquaviva managed the family finances and made all of the important financial and investment decisions for the family without input from petitioner. Petitioner managed their household, purchased the family's groceries, clothing, and personal items, and cared for the children when they were young. Petitioner paid her personal expenses and those related to running the household by personal check drawn on a joint checking account that she maintained with her husband. However, petitioner relied on Mr. Acquaviva to pay the majority of the family's living expenses. Expenses such as the mortgage, homeowner's insurance, real estate taxes, life insurance, automobile payments, automobile insurance, State and Federal taxes, political contributions, and expenses for live-in help were all paid out of Mr. Acquaviva's personal account. Petitioner was not a signatory on her husband's personal checking account. Petitioner never asked Mr. Acquaviva how much money was in his personal checking account. Mr. Acquaviva made funds available to petitioner through the couple's joint checking account by depositing funds drawn from his personal checking account. Petitioner never asked how much she

could spend; if she needed additional funds, she simply asked her husband to deposit more money into their joint account.

Petitioner's education ended with high school. Petitioner had no training or background in accounting, business, or finance, with the exception of running a retail clothing business called "Unique Boutique", which Mr. Acquaviva set up as an amusement for her.[3] Petitioner's participation in her husband's business was limited to decorating some of the model houses which he built. Petitioner was otherwise unemployed during the relevant years.

B. Mr. Acquaviva's Business Activities

During the years in issue, Mr. Acquaviva did not conceal his business activities or the family's financial affairs from petitioner. However, Mr. Acquaviva generally did not discuss his investments or the family's financial affairs with petitioner. Mr. Acquaviva usually did not conduct business at home. Petitioner did not question her husband's decisions. Petitioner trusted her husband and believed he would do what was best for the family.

Shortly after his marriage to petitioner in 1960, Mr. Acquaviva took over his father's refrigerator repair service. He

---

[3] Although petitioner was the owner/operator of this dress shop, she left all of the business decisions to her husband. During the 4 years that petitioner's dress shop was in operation from 1982 through 1985, the business incurred a net loss of $27,455.

eventually developed it into a commercial heating and air conditioning business. Sometime during the early 1980's, Mr. Acquaviva and Frank DiMisa (Mr. DiMisa), a real estate developer from Staten Island, New York, entered into a venture to develop a residential subdivision. Mr. Acquaviva eventually changed his business from mechanical contracting to residential real estate development.

Mr. Acquaviva became a successful real estate developer. In the years following his initial project with Mr. DiMisa, Mr. Acquaviva's real estate activities expanded to encompass over 25 different ventures. Over the years, Mr. Acquaviva reinvested the proceeds from his development activities in additional land purchases and, in turn, future development projects.

Mr. Acquaviva's primary source of credit for his real estate activities was City Federal Savings Bank (City Federal). City Federal was declared insolvent and taken over by the Office of Thrift Supervision in December of 1989. Mr. Acquaviva's primary source of credit thus disappeared, and he no longer was able to meet his debt obligations. An investigation of City Federal by the U.S. Attorney's Office and the Resolution Trust Corporation (RTC) revealed that in 1985 Mr. Acquaviva and Mr. DiMisa paid $75,000 to a senior lending officer at City Federal in order to obtain approval of a development loan. Mr. Acquaviva was charged with, and pleaded guilty to, conspiracy to commit bribery in 1992. Mr. Acquaviva did not tell petitioner about the

investigation until 2 weeks before he pleaded guilty.  In settlement of the RTC's claims, Mr. Acquaviva and his sons paid $7,825,000 in 1993.  This payment was partially funded by borrowing and was secured by the family's remaining assets which included the Acquavivas' home.

    1.  1985 Involuntary Conversion

    Mr. Acquaviva purchased a multistory commercial building located in Hoboken, New Jersey (Hoboken property), in 1973.  The Hoboken property was destroyed by fire in January 1985.  Mr. Acquaviva received $1 million from his insurance carrier in late 1985 as a settlement of the damage caused by the fire.  At the time of the fire, Mr. Acquaviva's adjusted basis in the Hoboken property was $806,464.  On the Acquavivas' 1985 Federal income tax return, Mr. Acquaviva did not report any gain from this conversion, electing instead to defer the gain pursuant to section 1033.[4]  No statement was attached to the couple's 1987

---

[4]  Sec. 1033 provides that, under certain circumstances, a taxpayer may defer the taxation of gain realized on an involuntary conversion.  Sec. 1033(a)(1).  Where condemnation proceeds are received in the form of money, replacement with like-kind property must be made within 2 years after the close of the year in which the landowner first receives the proceeds, in this case, by the end of the calendar year 1987.  The Commissioner's regulations direct that the details of an involuntary conversion of property resulting in a gain should be reported on the return for the year in which the gain is realized (in this case 1985) but that an election to defer recognition of gain will be deemed to have been made by a failure to include the gain in gross income in the year received.  Sec. 1.1033(a)-2(c)(2), Income Tax Regs.  The failure of the Acquavivas to report and pay tax on the gain from the involuntary conversion on
(continued...)

return identifying that the Hoboken property had been replaced, nor did they file an amended 1985 return reporting the gain. Petitioner conceded that the Hoboken property was not properly replaced pursuant to section 1033.

2.  1986 Condemnation

Mr. Acquaviva and Mr. DiMisa formed the Holmdel Golf & Country Club partnership (HGCC) in 1984 to develop land located in Monmouth County, New Jersey, into an exclusive residential community of luxury homes with an adjacent golf course and country club.  Mr. Acquaviva and Mr. DiMisa each owned a 50-percent interest in HGCC.

Mr. Acquaviva purchased two tracts of farm land located in Monmouth County and contributed them to HGCC in 1984. Petitioner's signature appears on various documents of title, mortgages, and closing statements related to this transaction.[5] HGCC acquired additional land in Monmouth County in January and October 1985.

---

[4](...continued)
their 1985 income tax return thus constituted an election to defer the recognition of the gain under sec. 1033.  See Cerny v. Commissioner, T.C. Memo. 1987-599.

[5]  It was necessary for petitioner to attend occasional real estate closings and personally sign various documents. Petitioner's signature was required along with her husband's as a guarantor and/or to release or convey any marital interest she may have had in the property being conveyed in connection with her husband's real estate development activity.

During 1985, the Monmouth County Board of Freeholders was considering the purchase and conversion of 457 acres of farmland into a public park, 366 acres of which was owned by HGCC. In July 1986, Monmouth County filed a declaration of taking against 279 acres of land owned by HGCC and deposited $14,524,600, the property's estimated fair market value, with the Superior Court of New Jersey. The condemnation proceedings, including the amount of the condemnation award, were reported in local newspapers; petitioner read some of these articles and attended a few of the public hearings concerning the condemnation.

Mr. Acquaviva consulted his accountant, Louis Defalco (Mr. Defalco), regarding the tax implications of the condemnation award. Mr. Acquaviva and Mr. DiMisa were advised by Mr. Defalco that they had the option of replacing the property and deferring the recognition of any gain or of recognizing the gain currently. Mr. DiMisa also suggested that Mr. Acquaviva and he discuss the matter with Herbert Gannette (Mr. Gannette), a tax attorney. In the interim, HGCC reported a gain in the amount of $7,678,378 from the condemnation on its 1986 Form 1065, U.S. Partnership Return of Income. HGCC issued checks to each partner for $3,869,244, which represented each partner's share of the proceeds from the condemnation award after deduction of expenses. Mr. Acquaviva deposited his share into his personal checking account. However, HGCC subsequently filed an amended Form 1065, electing to defer this gain pursuant to section 1033.

Mr. Acquaviva intended to reinvest the proceeds from the condemnation into another venture with Mr. DiMisa. In the fall of 1987, Mr. Acquaviva and Mr. DiMisa sought legal advice from Mr. Gannette regarding the 1986 condemnation gain. Mr. Gannette advised the partners that in seeking the benefits of section 1033, HGCC would be regarded as an entity separate from its partners, and, as such, it was incumbent upon HGCC, not the partners individually, to acquire and hold replacement property in its trade or business. Mr. DiMisa, however, decided not to enter into another venture with Mr. Acquaviva through HGCC; he decided to report his share of the taxable income related to the 1986 condemnation. Thus, the 1986 condemnation proceeds were never reinvested by HGCC. Mr. Defalco prepared an amended 1986 individual income tax return which reported Mr. Acquaviva's proportionate share of HGCC's gain from the 1986 condemnation. Mr. Defalco delivered the amended return to Mr. Acquaviva for filing. Mr. Acquaviva never filed this amended return. Mr. Acquaviva explained that he could not afford to pay his share of the tax liability because he had used the condemnation proceeds to, among other things, purchase other properties in contemplation of either contributing or selling them to HGCC. Mr. Acquaviva never told petitioner of his discussions with Mr. DiMisa, Mr. Defalco, or his tax attorney concerning the involuntary conversion, nor did he discuss with her his decision to ignore the advice of his professional advisers. Petitioner

concedes that the gain realized on the 1986 condemnation award should have been reported on an amended 1986 return.

3. Magnum Development Corp.

During the 1986 and 1987 taxable years, Magnum was a closely held real estate development corporation owned by Mr. Acquaviva and three of his sons. Magnum functioned as the general contractor on Mr. Acquaviva's residential real estate development projects. Mr. Acquaviva occasionally made cash advances to Magnum. No promissory notes were executed and Magnum did not pay interest on the funds advanced.

Magnum paid some of Mr. Acquaviva's personal expenses. During 1986, Magnum paid $23,890 for the installation of a swimming pool at the Acquavivas' home and $20,000 for home improvements. In 1987, Magnum paid $23,552 for landscaping services benefiting the Acquavivas' home and, in addition, issued a check in the amount of $4,400 directly to Mr. Acquaviva. Magnum accounted for these transactions on its books as reductions in the amount it owed Mr. Acquaviva. Magnum never declared a dividend during 1986 or 1987. Respondent determined that these amounts paid on behalf of or directly to Mr. Acquaviva were dividends.

C. Tax Return Preparation

Mr. Acquaviva did not discuss tax matters with his wife. She expected him to take care of such matters. During the years in issue, Mr. Acquaviva or his son Christopher ensured that tax

returns were filed. During 1985, 1986, and 1987, Mr. Acquaviva had joint returns prepared. He did not present these returns to petitioner for her review or signature but rather filed the 1985 and 1987 returns without her signature and signed her name to the 1986 return. Petitioner did not file separate returns for any of the years in issue. Petitioner knew that there was a responsibility to file returns but assumed that "my husband would have taken care of that." Petitioner filed joint income tax returns with her husband during their marriage but could not recall for which taxable years.

Mr. Acquaviva used the accounting firm of Defalco & Co. for tax and accounting services for more than 20 years. In addition to advising Mr. Acquaviva on tax matters concerning his enterprises, Mr. Defalco also advised Mr. Acquaviva on personal tax matters. Defalco & Co. prepared the Acquavivas' income tax returns during the years in issue. Mr. Acquaviva filed Federal income tax returns electing the status of "Married filing joint return" for all of the years in issue.

Petitioner knew that Mr. Defalco had a longstanding professional relationship with her husband. Petitioner was not involved in the preparation of the couple's income tax returns. Neither Mr. Acquaviva nor Mr. Defalco discussed the returns with petitioner. They did not discuss the advantages or possible disadvantages of filing a joint return with petitioner. Petitioner did not give her husband express consent to file the

returns on her behalf, although she knew that the returns had been prepared by the same accountant for many years and was confident in his abilities.  Petitioner never asked to review the returns.  Petitioner trusted her husband and relied on his judgment.  Petitioner executed a Form 2848, Power of Attorney and Declaration of Representative, designating her husband's accountant to represent her concerning the IRS audit of the 1986 and 1987 returns.

OPINION

A.  Joint Returns

We must first decide whether petitioner filed a joint return for each of the taxable years in issue.  If petitioner did not file a joint return for the taxable years 1985 through 1987, then she is not liable for the deficiencies determined by respondent, and the question of petitioner's innocent spouse status becomes moot.  See Davenport v. Commissioner, 48 T.C. 921 (1967).  Generally, a nonsigning spouse is not liable for taxes shown to be due on a return or later determined as a deficiency.  Januschke v. Commissioner, 48 T.C. 496, 500 (1967).  We have, however, recognized that joint liability arising from a return is not necessarily defeated because one spouse did not sign the return.  Estate of Campbell v. Commissioner, 56 T.C. 1, 12-13 (1971); Federbush v. Commissioner, 34 T.C. 740, 757 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963).  Rather, the determining factor is whether the spouses "intended to file and be bound by

the particular return in question." Shea v. Commissioner, 780 F.2d 561, 567 (6th Cir. 1986), affg. in part, revg. in part, and remanding T.C. Memo. 1984-310; Januschke v. Commissioner, supra at 500. Whether petitioner intended to file a joint return is a question of fact. O'Connor v. Commissioner, 412 F.2d 304, 309 (2d Cir. 1969), affg. in part and revg. in part on another issue T.C. Memo. 1967-174. In the instant case, petitioner did not sign the returns; the burden therefore is on respondent to produce evidence of petitioner's intent to file a joint return with Mr. Acquaviva. Id.

Petitioner knew that her husband's longtime accountant, Mr. Defalco, prepared the subject returns, and she was confident in his abilities. Petitioner designated Mr. Defalco to represent her during the audit of the 1986 and 1987 returns. Thus, she had the opportunity to raise an objection to the joint filing of the returns with the examining agent at the audit level but chose not to do so. Cf. Estate of Campbell v. Commissioner, supra at 14.

Income from petitioner's dress shop was reported on Schedule C of the 1985 return. Gain from the sale of the real property used by her dress shop, which she held as a joint owner with her husband, was included on the 1986 return. Although not conclusive, the inclusion of a spouse's income on a return has been regarded as a factor supporting the conclusion that the particular return in question was intended as a joint return. Federbush v. Commissioner, supra at 756. Petitioner testified

that she was aware of her duty to file, having done so in past years. Petitioner also testified that she had filed joint returns with her husband during their marriage, though she did not recall which joint returns she may have signed. We also find it significant that petitioner never filed a separate return, nor did she ever object to the filing of joint returns either to her husband or his accountant.

There was a general understanding between petitioner and her husband that he would handle the family's financial and business matters, including the preparation and filing of tax returns. Petitioner never asked to review the subject returns because she believed it was not necessary. Petitioner trusted her husband and relied on his judgment. We believe that her reliance on Mr. Acquaviva's judgment is indicative of petitioner's intent; in other words, "She intended the returns to be filed as he chose." Estate of Campbell v. Commissioner, supra at 13. Based on the foregoing, we conclude that petitioner intended to file, and did file, joint returns for each of the 3 taxable years in issue.

B. Constructive Dividends

Petitioner contends that the payments made by Magnum in 1986 and 1987 to, or on behalf of, her husband were repayments of loans that he made to Magnum. Respondent determined that Magnum did not have a bona fide debt to Mr. Acquaviva; any payments, therefore, were dividends to Mr. Acquaviva.

The characterization of these payments depends upon whether Mr. Acquaviva and Magnum intended to create a bona fide debtor-creditor relationship.  Williams v. Commissioner, 627 F.2d 1032 (10th Cir. 1980), affg. T.C. Memo. 1978-306; Commissioner v. Makransky, 321 F.2d 598, 600 (3d Cir. 1963), affg. 36 T.C. 446 (1961).  If a bona fide debtor-creditor relationship existed, then the payments by Magnum may be properly characterized as the repayment of that debt.  See, e.g., Schaefer v. Commissioner, T.C. Memo. 1994-444.  If however, as respondent contends, there was no bona fide debtor-creditor relationship, then the payments may be characterized as dividends to Mr. Acquaviva.  See Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968); Commissioner v. Makransky, supra.  The proper characterization is a question of fact to be determined on the basis of all of the facts and circumstances.  Gilbert v. Commissioner, 262 F.2d 512, 513 (2d Cir. 1959), affg. T.C. Memo. 1958-8; Georgia-Pac. Corp. v. Commissioner, 63 T.C. 790, 795 (1975).  The burden is on petitioner to show that there existed a bona fide indebtedness and that the amounts in question were the repayment of that debt. Rule 142(a).

Courts have considered various factors in determining whether shareholder advances are debt or contributions to capital.[6]  In making our determination, we recognize that

[6]  The Court of Appeals for the Third Circuit, to which
(continued...)

transactions between shareholders and their closely held

corporations require special scrutiny because of the apparent

lack of a true arm's-length relationship between the two.  Fin

Hay Realty Co. v. United States, supra at 697; J.A. Tobin Constr.

Co. v. Commissioner, 85 T.C. 1005, 1022 (1985).  This scrutiny is

particularly applicable where a shareholder advances funds to a

corporation and characterizes the transaction as creating a

corporate obligation instead of a contribution to capital.  Fin

Hay Realty Co. v. United States, supra at 697.

Petitioner argues that the requisite intent to create a bona

fide debt existed between Mr. Acquaviva and Magnum.  In support

---

[6](...continued)
appeal in this case lies, uses the following nonexclusive list of
16 factors:

> (1) the intent of the parties; (2) the identity between
> creditors and shareholders; (3) the extent of participation
> in management by the holder of the instrument; (4) the
> ability of the corporation to obtain funds from outside
> sources; (5) the "thinness" of the capital structure in
> relation to debt; (6) the risk involved; (7) the formal
> indicia of the arrangement; (8) the relative position of the
> obligees as to other creditors regarding the payment of
> interest and principal; (9) the voting power of the holder
> of the instrument; (10) the provision of a fixed rate of
> interest; (11) a contingency on the obligation to repay;
> (12) the source of the interest payments; (13) the presence
> or absence of a fixed maturity date; (14) a provision for
> redemption by the corporation; (15) a provision for
> redemption at the option of the holder; and (16) the timing
> of the advance with reference to the organization of the
> corporation.  [Fin Hay Realty Co. v. United States, 398 F.2d
> 694, 696 (3d Cir. 1968); fn. ref. omitted.]

These factors are only aids to be used in determining
whether a bona fide debtor-creditor relationship existed between
Mr. Acquaviva and Magnum.  See id. at 697.

of her position, petitioner offered the testimony of Mr. Acquaviva, her son Christopher, who during the years in issue served as Magnum's treasurer, and their accountant, Mr. Defalco. Petitioner also presented copies of Magnum's automated general ledger and accounting records as evidence of a bona fide debt.

Respondent contends that petitioner has not met her burden of proof. Statements of intent must be considered in the context of the surrounding circumstances. Williams v. Commissioner, supra at 1034. What few formal indicia surrounded Mr. Acquaviva's advances were minimized by the lack of other objective factors to support the conclusion that they were loans. Petitioner offered no evidence of indebtedness, e.g., loan agreements, promissory notes, repayment schedules, or collateral posted to secure the alleged loans. There was no interest reflected in any of the 1986 and 1987 payments, nor was there any evidence that these payments were made to satisfy a debt between Magnum and Mr. Acquaviva. Petitioner did not introduce Magnum's corporate minutes into evidence. Furthermore, Mr. Acquaviva, a 25-percent shareholder in Magnum, did not get formal authorization from the other shareholders for the loans. Petitioner has failed to prove that Magnum owed a bona fide debt to Mr. Acquaviva.

Petitioner has not argued that Magnum lacked earnings and profits during 1986 and 1987. See secs. 301, 316. We sustain respondent's determination on this issue.

C. <u>Innocent Spouse</u>

Section 6013(a) provides that spouses may elect to file a joint Federal income tax return.  If a husband and wife file a joint return, the tax is computed on their aggregate income and the liability with respect to such tax is joint and several. Sec. 6013(d)(3); <u>Gordon v. United States</u>, 757 F.2d 1157, 1160 (11th Cir. 1985).  Section 6013(e)(1), however, relieves a spouse of this joint and several liability for tax if he or she can show that (1) a joint Federal income tax return was filed by the spouses; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the claimed "innocent spouse" did not know, and had no reason to know, of the substantial understatement; and (4) taking into account all the facts and circumstances, it would be inequitable to hold this claimed "innocent spouse" liable for the deficiency attributable to the understatement.  Sec. 6013(e)(1).  A spouse seeking relief under section 6013(e) has the burden of proving that each requirement has been satisfied.  Because the statute is phrased in the conjunctive, petitioner's failure to satisfy any one of these elements will preclude "innocent spouse" relief.  <u>Purificato v. Commissioner</u>, 9 F.3d 290, 293 (3d Cir. 1993), affg. T.C. Memo. 1992-580.

We have found that petitioner filed a joint return for each of the years in issue, and respondent concedes that there was a

substantial understatement of tax attributable to Mr. Acquaviva. Accordingly, we must decide whether: (1) Petitioner lacked actual and constructive knowledge of the understatements; and (2) it would be inequitable to hold her liable for the deficiencies.

1. <u>Knowledge or Reason To Know</u>

Courts have consistently held that the knowledge contemplated by section 6013(e)(1)(C) is knowledge of the underlying transaction and not of the tax consequences of that transaction. <u>Purcell v. Commissioner</u>, 86 T.C. 228, 237-238 (1986), affd. 826 F.2d 470 (6th Cir. 1987). Petitioner must show a lack of actual knowledge as well as that she had no reason to know of the substantial understatement. In determining whether petitioner had reason to know within the meaning of section 6013(e)(1)(C), we must inquire whether a reasonably prudent person, under petitioner's circumstances, could have been expected to know at the time of signing each of the returns that the returns contained a substantial understatement. <u>Bokum v. Commissioner</u>, 94 T.C. 126, 148 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

We look to the following factors to determine whether or not petitioner had reason to know that the returns in question contained a substantial understatement: (1) Petitioner's level of education; (2) petitioner's involvement in the family's business and financial affairs; (3) whether there was a

substantial unexplained increase in the family's standard of living; and (4) the conduct of petitioner's husband in concealing the true state of the family's finances.  <u>Hayman v. Commissioner</u>, 992 F.2d 1256, 1261 (2d Cir. 1993), affg. T.C. Memo. 1992-228.

### a.  Education

Petitioner possessed only a high school education. Petitioner lacked meaningful business experience and knowledge pertaining to finances or tax return preparation.

### b.  Family Business

Petitioner's knowledge of the family's financial affairs and her husband's business affairs was minimal.  Petitioner's participation in her family's financial affairs was limited to access to the couple's joint bank account which she used to pay incidental household and family expenses.[7]  Mr. Acquaviva dominated the couple's financial affairs throughout their marriage.  Mr. Acquaviva completely insulated petitioner from the family's financial picture as well as his business activities. We are convinced that petitioner had no voice in the family's financial and business decisions.  Petitioner was not in a position to know how much income her husband generated from his

---

[7] Cf. <u>Price v. Commissioner</u>, 887 F.2d 959, 965 (9th Cir. 1989) (wife had limited involvement in family finances despite responsibility of paying mortgage); <u>Hinds v. Commissioner</u>, T.C. Memo. 1988-426 ("innocent spouse" relief allowed for wife whose participation in family's financial affairs was limited to accepting money from husband to pay household expenses and purchase family's food and clothing).

real estate activities, which activities generated that income, or how he invested that income.

### c. Family Lifestyle

Petitioner enjoyed an affluent lifestyle during the years in issue, but that lifestyle was consistent with that of preceding years. The record reflects that the family lived in the same five-bedroom home located in an upscale neighborhood of Holmdel, New Jersey, prior to and during the years in issue. The record also indicates that items of jewelry, luxury automobiles, household help, family vacations, and a summer home had all been a part of the family's lifestyle since at least the mid-1970's.

Respondent points out that Mr. Acquaviva gave his wife several items of expensive jewelry in 1985, focusing on the value of the gifts in relation to the family's adjusted gross income. We are mindful that "one person's luxury can be another's necessity, and the lavishness of an expense must be measured from each family's relative level of ordinary support." Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975). We note that these items were given to petitioner in conjunction with the couple's 25th wedding anniversary and, though expensive, were not disproportionate to the Acquavivas' standard of living.

### d. Evasiveness

Mr. Acquaviva, while not evasive, did not share information about his financial decisions or his business activities with petitioner. Mr. Acquaviva considered all matters related to his

business and family finances to be his domain.  We are convinced that petitioner was unaware of her husband's discussions with Mr. DiMisa, Mr. Defalco, or his tax attorney concerning the involuntary conversions.  Further, we do not believe that Mr. Acquaviva told petitioner, or that she knew, of his decision to ignore the advice of his advisers with regard to the 1986 condemnation.

Respondent contends that petitioner had a duty to inquire and that she failed to do so.  Specifically, respondent argues that because petitioner knew of the 1985 fire and the 1986 condemnation and the substantial amounts involved, petitioner had a duty to inquire as to the proper tax treatment of the 1985 and 1986 involuntary conversion proceeds and the constructive dividends.  We think that, under the circumstances presented here, it was reasonable that petitioner did not ask her husband about the tax consequences of the involuntary conversion proceeds and the corporate distributions.[8]  Petitioner trusted her husband to do what was best for her and their family, including ensuring that the family's tax returns were properly prepared and filed. Petitioner also knew that her husband had a long-standing

---

[8] We also note that, contrary to respondent's belief, failure to inspect a Federal income tax return does not automatically preclude innocent spouse relief.  See, e.g., Terzian v. Commissioner, 72 T.C. 1164, 1171 (1979) ("the fact that * * * [the taxpayer] signed the return without reading it does not require the conclusion that she had reason to know of the omitted income").

professional relationship with his accountant, Mr. Defalco, and that he prepared the couple's tax returns as well as the returns for the entities that Mr. Acquaviva controlled. Petitioner had no reason to question Mr. Defalco's ability. Moreover, when the 1985 and 1986 returns were filed, there was no substantial understatement of tax attributable to the involuntary conversions. By operation of respondent's regulations, the Acquavivas were treated as having elected the provisions of section 1033 with the filing of the 1985 and 1986 returns. See sec. 1.1033(a)-(2)(c)(2), Income Tax Regs.

Based on our review of the record as a whole, we hold that petitioner did not know, and had no reason to know, of any substantial understatement of income on the couple's Federal income tax returns for the taxable years 1985, 1986, 1987.

2. Equity of Holding Petitioner Liable

The final requirement for innocent spouse relief is that, given all of the facts and circumstances, it would be inequitable to hold petitioner liable for the deficiency attributable to the substantial understatement. Sec. 6013(e)(1)(D). Although section 6013(e)(1)(D), as amended, no longer requires us to determine whether petitioner significantly benefited as a result of the omitted income, this factor is still considered in determining whether it is inequitable to hold petitioner liable. Purificato v. Commissioner, 9 F.3d at 296; sec. 1.6013-5(b), Income Tax Regs. Any significant benefit received by petitioner

must be considered in the totality of the circumstances. Purificato v. Commissioner, supra at 293; sec. 1.6013-5(b), Income Tax Regs.

      a.   1985 Taxable Year

Petitioner has not demonstrated that she did not realize a significant benefit from the 1985 insurance proceeds. Petitioner failed to produce the couple's joint checking account records for the 1985 tax year as she did for the 1986 and 1987 tax years. The failure of a party to produce relevant evidence within its possession or control gives rise to the presumption that, if produced, it would be unfavorable. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioner failed to meet her burden of proving that it would be inequitable, within the meaning of section 6013(e)(1)(D), to hold her liable for that portion of the deficiency related to 1985. Therefore, she is not an "innocent spouse" in 1985.

      b.   1986 Taxable Year

With respect to the 1986 condemnation award, a check representing Mr. Acquaviva's share of the condemnation award was deposited into his personal checking account. The bulk of the condemnation award was used in Mr. Acquaviva's real estate ventures, which failed in subsequent years. In this regard, we believe petitioner did not receive any of the benefits of

ownership from the condemnation award. Furthermore, we are satisfied that petitioner's lifestyle did not change on account of her husband's receipt of the condemnation award. Although petitioner may have received some benefit from the 1986 condemnation award, we believe that such a benefit did not exceed her normal level of support, which is not a significant benefit. Flynn v. Commissioner, 93 T.C. 355, 367 (1989).

We conclude that petitioner did not derive a significant benefit from Mr. Acquaviva's omission of the 1986 condemnation award. Accordingly, under the facts and circumstances of this case, we find that it would be inequitable to hold petitioner liable for that portion of the deficiencies in tax arising from Mr. Acquaviva's understatement of income attributable to the 1986 condemnation award.

The same cannot be said of the 1986 constructive dividends. Here the evidence demonstrates that petitioner benefited from the constructive dividends paid to Mr. Acquaviva. During 1986, Magnum paid $23,890 for the installation of a swimming pool at the Acquavivas' home and $20,000 for home improvements. Petitioner's lifestyle was enhanced by these home improvements. We find that the 1986 constructive dividend was used to benefit petitioner beyond normal support. We hold that it is not inequitable to hold petitioner liable for the portion of the deficiency attributable to the 1986 constructive dividends; thus,

she is not entitled to relief as an innocent spouse with respect to this item.

    c.  <u>1987 Taxable Year</u>

With respect to the 1987 taxable year, Magnum paid $23,552 for landscaping services to the Acquavivas' home and, in addition, issued a check in the amount of $4,400 directly to Mr. Acquaviva. Again, petitioner's lifestyle was enhanced by these landscaping services to her home. We find that the 1987 constructive dividend attributable to landscaping services benefited petitioner beyond normal support. With regard to the $4,400 check to Mr. Acquaviva, petitioner did not present any evidence on how it was used. Therefore, as to the $4,400, she has failed to establish that it would be inequitable to hold her liable for the deficiency. We hold that it is not inequitable to hold petitioner liable for the portion of the deficiency attributable to the 1987 constructive dividend; thus, she is not entitled to relief as an innocent spouse under section 6013(e) with respect to this item.

For the foregoing reasons, we hold that petitioner is entitled to "innocent spouse" relief under section 6013(e) for the portion of the deficiency for 1986 attributable to the condemnation award, but she is not entitled to "innocent spouse" relief with respect to the deficiency for 1985 or with respect to the portions of the deficiencies for 1986 and 1987 attributable to the constructive dividends.

D.  Additions to Tax

Section 6651(a)(1) imposes an addition to tax for failure to file a return on the date prescribed (determined with regard to any extension of time for filing) unless it is shown that such failure is due to reasonable cause and not due to willful neglect.  The taxpayer has the burden of showing the addition is improper.  United States v. Boyle, 469 U.S. 241, 245 (1985).

If any part of the underpayment is due to negligence or disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment.  Sec. 6653(a)(1) (for 1985); sec. 6653(a)(1)(A) (for 1986 and 1987). There is a further addition to tax in an amount equal to 50 percent of the interest payable with respect to the portion of the underpayment that is attributable to negligence.  Sec. 6653(a)(2) (for 1985); sec. 6653(a)(1)(B) (for 1986 and 1987).

Section 6661 provides for a 25-percent addition to tax on any substantial understatement.  Pallottini v. Commissioner, 90 T.C. 498 (1988).  A substantial understatement is one that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6661(b)(1).  The amount of the understatement, for purposes of section 6661, is to be reduced by the portion attributable to any item for which there was substantial authority or any item that was adequately disclosed. Sec. 6661(b)(2)(B).

Respondent determined that petitioner is liable for the additions to tax discussed above. Petitioner has offered no evidence with regard to any of the additions to tax. In fact, petitioner's briefs fail to address the additions to tax. The burden rests with petitioner to prove that respondent's determinations are in error. Rule 142(a). We cannot be sure that petitioner intended to abandon the issue, but in any case respondent's determination of the applicable additions to tax must be sustained with respect to any underpayment of tax or substantial understatement resulting from the omission of income in 1985 and from the constructive dividends in 1986 and 1987.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.